WILLIAM LAWRENCE v. WESTERN UNION TELEGRAPH COMPANY.

(Filed 22 March, 1916.)

1. **Telegraphs—Receiving Office—Negligence—Delivery.**

Evidence that a telegraph company received a telegram for transmission to an addressee well known at its delivery point to the people of the town and defendant's agent, at which he had an established place of business, and that the message was received at this place at 8:29 a. m. and if delivered before 9 a. m. the injury complained of would have been avoided, is *Held*, under the circumstances of this case, sufficient for the determination of the jury upon the issue of defendant's actionable negligence, and to sustain a verdict for actual damages.

2. **Telegraphs—Office Hours—Negligence.**

A telegraph company will not be held as negligent in the transmission of a telegram when it is shown that its agent received the message about the time the office at its destination had closed, and the relay office had sent a service message back with this advice.

3. **Telegraphs—Death Message—Notice—Relationship of Parties—Actual Damages—Burden of Proof.**

Where the sendee of a telegram announcing a death sues a telegraph company for its negligent failure to deliver it, and it appears that he

was not in any way related to the deceased, there is no presumption that he suffered mental anguish in being prevented by the negligence of the defendant from attending the funeral, but he may show such facts and circumstances upon which the jury may award actual damages, with the burden of proof on the plaintiff.

BROWN, J., dissenting.

APPEAL by defendant from *Connor, J.,* at December Term, 1915, of LENOIR.

*T. C. Wooten for plaintiff.*
*Moore & Dunn for defendant.*

CLARK, C. J. This action is brought to recover damages for negligent delay in delivering a telegram sent from Scotland Neck 14 December, 1914, announcing the death of Mr. Noah Biggs, and stating that the funeral would take place the next day at 3 p. m.

The complaint alleges that if the telegram had been delivered to the plaintiff that night he could have left Kinston next morning at 7:10 a. m. and would have reached Scotland Neck in time for the funeral. 'The uncontradicted evidence shows that a list of some sixty names, to whom telegrams of the same nature were sent, were filed in the office at Scotland Neck between 7:30 and 8 p. m., and that two of these messages were delivered that night to other parties in Kinston. It was further in evidence, however, that two other messages, among them that to the plaintiff, were not among these sixty which were first filed, but that these two belated messages were filed in the office at Scotland Neck "about 9 o'clock." It was shown that the hours of the defendant's office in Kinston were from 8 o'clock a. m. to 9 p. m., and that the Kinston office had been closed before this message could be received from Scotland Neck. There is no direct wire between the two points, messages being relayed at Norfolk. There is no evidence that this was unreasonable.

The court instructed the jury: "If you believe all the evidence in this case you will find that the agent at Scotland Neck was not instructed by the sender of this telegram to the plaintiff Lawrence until about 9 o'clock, and that at that time the office of the defendant at Kinston was closed. . . . So, gentlemen of the jury, the only question left for you to consider on this first issue is, whether there was negligence on the part of the company in delivering this message to the plaintiff Lawrence after it was received in Kinston on Tuesday morning." If there was error in this, the defendant cannot complain, and the plaintiff is not appealing.

Upon this issue the evidence of the plaintiff himself was that the train had left for Scotland Neck at 7:10 a. m.; that it was 90 miles over dirt

road, and that he could not have reached there by automobile in less than six hours in the condition the roads were at that time, in December, and that after he received the message, which was at 10 a. m., he "tried to find an automobile." "There was but one automobile that I knew of that would go under the circumstances, and he was out of town. He came back to town at 11 o'clock a. m. . . ." He says further: "I could have reached Scotland Neck by automobile by 3 o'clock if the telegram had been delivered at 9 o'clock. The driver told me so."

It was in evidence by the operator at Scotland Neck that the message was received there at 8:52 p. m. (their usual closing hour being 8 p. m.), and that his office received reply from Norfolk, to which it was sent in regular course to be relayed to Kinston, that the message to Lawrence could not be delivered, as the Kinston office had closed, and it would have to lie over till the next morning. The telegram was in evidence, and on its face bore a notation that it was received at Kinston at 8:29 a. m. There is still left open the allegation of negligence in that the message having been sent to Norfolk the night before, and its urgency being shown on its face, that it should have been delivered to the office in Kinston immediately after 8 o'clock or at any rate earlier than 8:29, and further, that even if received at 8:29, with proper diligence, in a town of the size of Kinston, the telegram, which on its face showed that it had been received at Scotland Neck the night before, should have been delivered before 9 a. m. The plaintiff testifies that if he had received it by that time he could have reached Scotland Neck before 3 p. m. by automobile.

Whether this delay was negligence or not, under all the attendant circumstances, was purely an issue of fact for determination by the jury, and is not an issue of law which this Court can review. The jury have found upon evidence sufficient to be submitted to them that there was negligence in this respect, and the motion for a nonsuit was properly denied.

It was in evidence that the plaintiff had lived in Kinston sixteen years; that he had an established place of business on a public street in the town of Kinston where he had been a resident for more than sixteen years, and was well known to the local manager of the telegraph company as a barber in a public barber shop in the town. It was not error for the judge to charge that "If the telegram was not actually delivered to the plaintiff until 10 o'clock, that is, until an hour and a half after time at which the defendant says that the telegram arrived at its office in Kinston, that this was evidence of negligence to be considered by the jury." It is true that the defendant says that it had enough messenger boys to handle its ordinary business, but that they all happened to be out at the time this message was received. This was a matter of defense for

the jury to consider, whether in fact there was a sufficient number of messengers or not and whether their absence justified the failure to get an additional messenger on this occasion and the delay of an hour and a half, if the plaintiff's testimony is to be believed, in the delivery of this telegram.

We need not consider the second exception, for the exclusion of the affidavit of Rev. Mr. McFarland that he delivered the message to the office in Scotland Neck "about 9 p. m.," for the judge instructed the jury that upon the evidence there was no negligence in failing to deliver the message that night.

·The only other exception that we need consider is to the following part of the charge of the court: "In this case, there is nothing in the evidence which would justify the jury in presuming that there was any injury received by this plaintiff. The burden would be upon him to satisfy you that the relations between him and Mr. Biggs were such that he suffered an injury by his failure to get to Mr. Biggs' funeral. If this evidence satisfies you by its greater weight that the relations between these men were such that by reason of his inability to get to the funeral the plaintiff did suffer mental anguish of mind, then it is for you, gentlemen of the jury, to say upon all the evidence what sum would compensate him for this injury."

The defendant was put on notice by the receipt of more than sixty telegrams announcing the death of Mr. Biggs and the hour of his funeral that he had many friends who would probably wish to attend and pay this last sad tribute of respect to his memory. It is true, the plaintiff was a colored man; but the testimony is that he had been Mr. Biggs' driver for eight years, and then for many years sexton of the church in Scotland Neck of which Mr. Biggs was an active and prominent member; that whenever Mr. Biggs came to Kinston he almost always came to see him. It was also in evidence that when the family of Mr. Biggs made up the list of those whom they wished notified and given an opportunity to attend the funeral, and it was found that the name of the plaintiff and the name of Mr. Archibald Johnson, editor of *Charity and Children,* had been omitted, these names were at once added. There was also evidence, from others than the plaintiff, that he was held in high estimation by Mr. Biggs, who often spoke of him "in very high and complimentary terms and evidently thought a great deal of him. The plaintiff is held in high estimation in Scotland Neck."

The plaintiff himself testified that he had been requested by Mr. Biggs to act as pall-bearer, and that he was much grieved that he was unable to do so, because Mr. Biggs had expressed that wish, and "I wanted to fulfill his request. He had been a friend to me and I had learned to love him; he had been one of my best white friends, and had always been.

I have never gotten over it. It was always grievous to my very mind and soul because I did not get there, and there is never a day .passing but it has been on my mind."

It is true that the deceased was a white man and that the plaintiff is a colored man; but according to the uncontradicted evidence the plaintiff was held in high estimation by the public; he was a warm personal friend and evidently an admirer of Mr. Biggs, and had been told by him that he desired him to act as pall-bearer at his funeral. It was also in evidence that when in the list of more than sixty names to whom similar telegrams had been sent it was discovered that the name of the plaintiff. and of Mr. Arch. Johnson, editor of *Charity and Children,* had been omitted, the family had messages for those two phoned down to the operator at Scotland Neck. It is by no means impossible, indeed, it is a matter of common knowledge, that the most kindly and cordial relations frequently exist between men of the two races who have received mutual assistance from each other or been engaged in the same calling, as here the driver of Mr. Biggs and the sexton of the church in which he was a leading member. There is no rule of law that the jury must disbelieve the statement of the plaintiff that he was much grieved at not being able to attend Mr. Biggs' funeral, and that the disappointment was a great one to him of losing the satisfaction and the honor of being a pall-bearer at the funeral of his former employer, whom he highly honored and loved. It is to the credit of human nature that such kindly relations can exist and often do exist between men of the two races, and a jury of Lenoir County, composed entirely of white men, have found as a fact that those relations did exist between the plaintiff and Mr. Biggs and that it was a grievous disappointment to the plaintiff that he should not have been able to comply with his own wish, in fulfillment of Mr. Biggs' request, to be a pall-bearer at his funeral.

When there is negligence in the delivery of a telegram concerning a pecuniary transaction, it is comparatively easy, ordinarily, to calculate the damage sustained. But there is no less a wrong calling for compensation in the delay or nondelivery of a message of this kind. It is true that there is no blood relationship between the plaintiff and the deceased. The only relation is that of mutual esteem. Nearness in blood is only material when the presumption of anguish is relied on. When there is close blood relationship such presumption arises without additional proof. When there is not close relationship of blood, or no relation of that kind, then mental anguish must be shown and that the negligence of the defendant was the proximate cause thereof. *Hunter v. Tel. Co.,* 135 N. C., 458, especially the concurring opinion of *Walker, J.,* at pp. 468-472.

In *Harrison v. Tel. Co.,* 143 N. C., 150, the Court sustained a claim of damage from mental anguish for delay in the delivery of a telegram

which if promptly delivered would have enabled the plaintiff to attend the funeral of a stepson. *Brown, J.,* said: "There is no presumption of mental anguish growing out of the relation of stepmother and son; but under our decisions it is a fact the plaintiff may prove, if she can, to the satisfaction of the jury, for the state of the mind is as much susceptible to proof as the condition of the stomach.".

In *Bright v. Tel. Co.,* 132 N. C., 322, this Court said: "The law does not regard so much the technical relation between the parties or the legal status in respect to each other as it does the actual relation that does exist and the state of feeling between them. It does not raise any presumption of mental anguish when there is no relation by blood, but if mental suffering does actually result upon the failure to deliver a message when there is only affinity between the parties, it may be shown and damages recovered." This case is cited as authority in *Harrison v. Tel. Co.,* 136 N. C., 381, which also cites *Cashion v. Tel. Co.,* 123 N. C., 267, which said: "We do not mean to say that damage for mental anguish may not be recovered for the absence of a mere friend, if it actually result; but it is not presumed." To the same purport are all our authorities.

No error.

BROWN, J., dissenting: It is admitted in the opinion of the Court that there is no evidence of negligence upon the part of the defendant in failing to deliver the message the night it was filed at Scotland Neck, as it was not filed until about the closing hour of the Kinston office.

I am of opinion that there is no evidence of negligence in the delivery next morning. The message was received at Kinston at 8 :29 a. m. and delivered, according to plaintiff's evidence, at 10 a. m. The testimony tends to prove that the messenger boy searched for plaintiff an hour and a half before finding him; that he went to his home and to his barber shop, and did not find him at either place; that he continued the search, and found plaintiff at Mrs. Harvey's at 9 :35 a. m. The plaintiff admits he was at Mrs. Harvey's doing some work, and that the message was delivered to him there about 10 a. m. Taking all the evidence into consideration, there is no evidence of unreasonable delay in delivering the message after it was received at the Kinston office.

Again, it is admitted that plaintiff could not have reached Scotland Neck by train, as the only train left at 7 :10 a. m., and the message was not received at the Kinston office until 8 :29. In fact, the Kinston office did not open until after the train had left. Plaintiff swears it is 90 miles from Kinston to Scotland Neck, and that it requires six hours to make the trip by automobile. Plaintiff further says: "I tried to find an automobile. There was not but one automobile that I knew of that would go under the circumstances, and he was out of town. He

came back in town about 11 o'clock.  I asked him if he would carry me to Scotland Neck.  I asked him what it would cost.  He says: '$20.' I says:  'If you will guarantee to get me there by 3 o'clock, I will pay it.' "  The auto man told him it was too late.

This evidence is conclusive that had the message been delivered by 9 a. m. the plaintiff could not have made the trip by auto.  Furthermore, I am of opinion that damages for mental anguish are not properly recoverable upon the facts of this case.  The rule that plaintiff can recover only such special damages as may be said to have been within the *contemplation* of both parties applies to damages for mental anguish as well as for actual pecuniary loss.  37 Cyc., p. 1781.  In support of the text are cited cases from all the so-called "mental anguish" courts, including this Court:  *Williams v. Tel. Co.,* 136 N. C., 82; *Bowers v. Tel. Co.,* 135 N. C., 504; *Sparkman,* 130 N. C., 447; *Darlington,* 127 N. C., 448; *Kennon,* 126 N. C., 232.

In all these courts, in order to prevent intolerable litigation, this rule and limitation has so far been adhered to in applying the doctrine. Many of these courts in recent cases have expressed a disinclination to extend the doctrine beyond the limitations established by the earlier decisions, requiring that the damages recoverable shall not only be the proximate result of the negligence complained of, but shall have been reasonably within the contemplation of the parties.  37 Cyc., 1779, and cases cited in note.

The doctrine of mental anguish was first promulgated in Texas in 1881, and has now become firmly established there, and yet that Court holds that the addressee cannot recover for mental anguish caused by delay in delivery of a telegram announcing the death of a brother-in-law unless the company was put upon notice that a failure to deliver would cause such anguish.  *Tel. Co. v. McMillan,* 30 S. W., 298.

The same Court holds that a telegraph company through whose failure to deliver a message plaintiff was prevented from visiting his dying stepfather is not responsible for mental suffering unless the circumstances were such as to give the company notice that tender and affectionate relations existed between the parties.  *Tel. Co. v. Garrett,* 34 Tex., 649; *Tel. Co. v. Coffin,* 30 S. W., 897.

I think the consensus of judicial opinion in the "mental anguish States" is that the telegraph company is charged with notice of the relationship which actually exists between the parties named, whether disclosed by the terms of the message or not; but where no blood relationship existed and mental anguish damages are claimed upon the ground of the existence of tender and affectionate relations, the company must be fixed with knowledge of the existence of such relations.

The defendant not only moved to nonsuit, but asked the court to charge: "If the jury should find from the evidence that at the time of the transmission of the message the defendant had no notice that the failure on its part to transmit would cause mental anguish to the plaintiff, then the plaintiff would not be entitled to recover."

I think the court erred in denying the motion and the prayer for instruction. There was no blood relationship, for plaintiff is a negro and the deceased was a white man. There is nothing in the evidence tending to fix the company with any knowledge that tender and affectionate relations existed between them. Certainly it does not appear on the face of the message, and there are no circumstances in evidence tending to fix defendant with such knowledge.

Sixty similar telegrams were sent announcing Mr. Biggs' death. The one to plaintiff contains nothing except a mere announcement of the death and time of funeral. There was no invitation to be a pall-bearer, as claimed by the plaintiff. The deceased was a white man of much prominence in the business and religious circles of the State. The plaintiff is a negro barber of Kinston and had been residing there for sixteen years. It is true, the plaintiff testifies that the fact that he did not get to the funeral as a pall-bearer was "very grievous to my very mind and soul." It is a wonder that he has survived the terrible shock to his sensitive heart. Yet upon cross-examination he admits that he worked for Mr. Biggs when he was a boy, and not since, and was sexton of the Baptist Church, but has not resided near Mr. Biggs for a great many years. He admits that Mr. Biggs came to Kinston on a visit and did not go near plaintiff, and that he did not go to see Mr. Biggs.

The whole evidence shows that plaintiff's agony is of that kind that can only be assuaged by a financial solatium. It has no real substantial foundation in fact, and is manifestly manufactured for the occasion.

It is such cases as this that bring the doctrine of mental anguish into such disrepute that it has been repudiated by the Supreme Court of the United States as well as by most of the State courts, including some of the ablest in the land. 37 Cyc., 1775, and notes. I realize that this Court has gone farther than the courts of the other mental anguish States in permitting the recovery of such damages in cases of distant relationship, but it has not up to this time gone so far as to permit a recovery in a case such as this. I think it time to call a halt and to observe those rules and limitations laid down in its earlier decisions and still applied in other jurisdictions.