MAGGIE GIBBS v. WESTERN UNION TELEGRAPH COMPANY.

(Filed 16 January, 1929.)

**1. Trial—Taking Case or Question From Jury—Motion of Nonsuit—Waiver.**

The defendant in a civil action for damages waives his right to maintain the insufficiency of the evidence to take the case to the jury by not making a motion as of nonsuit thereon at the close of the evidence. C. S., 567.

**2. Negligence—Proximate Cause—Definition of Proximate Cause.**

Negligence to be actionable must be the proximate cause of the injury in suit, or that cause which, in natural and continuous sequence, unbroken by any new or independent cause, produces the event, and without which it would not have occurred.

**3. Telegraph Companies—Telegrams—Liability for Negligence in Transmitting—Damages.**

A telegram received for transmission by a telegraph company reading, "Come at once, Lawrence is seriously shot and cannot live," is a death message, and in itself gives notice to the company that from its negligent failure to deliver it damages would likely be caused the sendee.

**4. Same—Mental Anguish—Relationship.**

Where a telegraph company receives a telegram for transmission and delivery, relating to sickness and death, so worded as to apprise it that damages would likely result to the addressee upon its negligent failure to deliver it, it is unnecessary for the company to have been notified of the relationship of the addressee as mother of the person named in the message in order for her to recover damages for her mental anguish proximately caused by the company's negligent delay, and she is not required to prove that such mental anguish was in fact suffered by her, as this will be presumed from the relationship of mother and son.

**5. Same—Damages—Questions for Jury.**

In an action by the mother, the addressee of a telegram informing her of the fatal shooting of her son and telling her to come, where there is evidence tending to show that she received the information first through the item of a newspaper too late to reach his bedside before his death, the jury may award such damages as they may find she had suffered as the proximate cause of the defendant's negligence in the delay of the delivery of the message sued on.

**6. Same—Duty to Minimize Damages.**

Where a telegram to a mother informing her of the fatal shooting of her son is delayed on its delivery, and there is evidence that she first received the information from another source in time to have reached his bedside before his death, and also evidence to the contrary: *Held,* under the doctrine requiring her to do what she reasonably could to minimize her damages, the question of whether she made every reasonable effort to reach the bedside of her son before his death is for the jury.

BROGDEN, J., dissenting.

APPEAL by defendant from *Deal, J.,* and a jury, at May Term, 1928, of HAYWOOD. No error.

This was an action for actionable negligence, brought by plaintiff against defendant for not delivering a death message.

The plaintiff alleges: "That the plaintiff is the mother of several children, and that on and prior to the grievance hereinafter mentioned her son, Lawrence Gibbs, had resided in the city of Asheville, N. C., for some time; and that on Monday morning, 27 December, 1926, about the hour of two o'clock a.m., the plaintiff's said son, Lawrence Gibbs, was mortally wounded, having been shot with a pistol just below his heart; and that thereafter at 7:33 a.m., on the same date, and as soon as the defendant company opened its Asheville office so maintained by it for the purpose of receiving and transmitting messages, the plaintiff's daughter-in-law, Mattie Gibbs, filed with the defendant company, and paid the usual and customary charges demanded by the company therefor, a message and telegram to the plaintiff in words and figures as follows, to wit:

'Asheville, N. C., 7:33 A.M.,
Dec. 27, 1926.

Maggie Gibbs,
　　　Waynesville, N. Car.

Come at once Lawrence is seriously shot and cant live.

MATTIE GIBBS.
801A.'

"That the said message was transmitted from the Asheville office by the defendant company to the Waynesville office of the defendant com-

pany, and received by the Waynesville office at one minute after eight o'clock on the said 27 December, 1926."

In answer the defendant says: "That defendant has no knowledge or information sufficient to form a belief as to the allegations contained in said complaint, except so much thereof as alleges that there was filed in its office in the city of Asheville, N. C., to be transmitted to the plaintiff, at Waynesville, N. C., a telegraphic message in words and figures substantially the same as that set out in said paragraph."

Mattie Gibbs testified, in part: "I live at 63 Clingman Avenue, Asheville, and am the wife of Lawrence Gibbs. I know Maggie Gibbs. She is the mother of Lawrence Gibbs, and on 27 December, 1926, lived in Waynesville, N. C. I do not know how long she has been living in Waynesville—practically all of her life, I suppose. On 27 December, 1926, she was living in Waynesville, over in the colored town, not very far from Main Street—I suppose about a quarter of a mile from Main Street—and I should think in sight of Main Street. . . . Lawrence Gibbs got shot. It was about 2:30 or 3 o'clock in the morning of 27 December, 1926. I sent a telegram to the mother of Lawrence Gibbs between 7 and 8 o'clock. I couldn't tell the exact hour. I did not go to the office of the company to send the telegram. I sent it over my telephone. The message, which you show me, is the message that I sent. The Western Union did not deliver to me that day any message to the effect that the message I sent had not been delivered to Maggie Gibbs. The first information I had that Maggie Gibbs had not received the message was on the morning of 28 December, 1926. I got that information from Samuel Gibbs, the son of Maggie Gibbs, who called me on the telephone. Maggie Gibbs came to Asheville on 28 December, 1926, about five or six hours after Lawrence had died. He died at five minutes past six o'clock on the morning of the 28th, and his mother came on the one o'clock train. I could not say when it gets to Asheville. The passenger train left Waynesville for Asheville about 11 o'clock, because it gets to Asheville about 1 or 1:30. I know it was 1 o'clock or after when she got to my house. That was the first passenger train leaving Waynesville going towards Asheville that day. The next one left at 5 o'clock that afternoon. Maggie Gibbs' son died before Maggie Gibbs arrived at my house."

Q. "What was the condition of Lawrence from the time he was shot up to the time he died with reference to whether he was conscious or unconscious?" A. "He was conscious. . . . My mother-in-law had no telephone in her house. The distance from Waynesville to Asheville was thirty-two miles."

Q. "Did he know people all the time?" A. "Yes, sir, he did."

Maggie Gibbs testified in part: "I am the mother of Lawrence Gibbs. On 27 December, 1926, I lived right where I live now, and have been living for ten years. I live within a quarter of a mile from here, in sight of Main Street. I do not know how far from Main Street, but not far. It might be 300 yards. I know where the Western Union Telegraph office was then. It was on that street going down to Charley Ray's store, just off of Main Street. It is right near the postoffice. I was at home all day 27 December, 1926. I was there that night till late in the evening I come to town. The Western Union Telegraph Company did not deliver to me any message of my son, Lawrence, having been shot. I first learned that he was shot after the train had run and my cousin asked me if I knew Lawrence was shot, and he said it was in the evening paper. It was after sundown."

Q. "What was the condition of the weather?" A. "Against I got home it had commenced raining, and it rained all night."

The plaintiff was then asked the following question:

Q. "Did you make any effort that night to go to Asheville to the bedside of your son?" A. "My son looked for us, and I first looked to see if she had wrote or sent us a telegram, and by that time it was after night."

Q. "State whether or not you made any effort to get an automobile at that hour to go to Asheville?" A. "My sister said she would let us have her automobile, but she couldn't drive it, and I couldn't. I went to Asheville to see my son on the first train the next day. I think it was due to leave Waynesville about 11 o'clock, but it was after that when we left. I did not have any other way of getting to Asheville, except on the train. When I got there my son had been dead four or five hours. I knew he was dead prior to the time I left here. I learned it that morning about 6 o'clock, I think. I had just got up. If the telegram introduced in evidence had been delivered to me any time on 27 December, prior to the running of the evening train, I could have left on the 11 o'clock train, or the evening train either one."

Q. "Would you have left on one of these trains?" A. "Yes, sir. I never felt right about not getting to the bedside of my son before he died, because I think I ought to have seen my child, and I could have seen him if I had gotten the telegram."

Q. "How did it affect you?" A. "I just can't stand to talk about it. Lawrence had lived in Asheville about ten years or more. Prior to that time he lived here in Waynesville."

Q. "After he moved from Waynesville to Asheville, state whether or not you were in the habit of from time to time going to see him and whether or not he would visit you; and if so, how often?" A. "He would come home to see me often.. (Cross-examination): I first heard that this message had been sent after the train passed here that night,

26 or 27 December, I reckon it was. I learned it out of the paper. I did not learn that the telegram had been sent until the night of the 27th. My son had to hunt it up. It was delivered to my son. It was never delivered to me. I found out about my son in Asheville being shot, after the evening train run. I don't know just when it was, but it was between sundown and dark. The train runs very late, and I come to town and found it out from the paper. I did not telephone to Asheville that night about it. My son telephoned. I wasn't with him. Next morning about 6 o'clock I found out my son was dead. Mattie phoned over to the preacher and he brought me word. My son was buried in Waynesville. I was at his funeral and came over with funeral procession from Asheville. From the time I heard on the afternoon of the 27th that my son had been seriously shot, I did not communicate with Asheville at all, but I had my son to. I wasn't able. After I got the information out of the paper. I didn't make any effort to get away to go to Asheville that night. My son did. A woman like me don't get out in the night. I did not myself make any effort to get a way to go to Asheville that night. I had no way to go to Asheville, and made no effort to go."

Q. "You had no way, and you made no effort to go? You didn't try to go on the bus, did you?" A. "Colored folks don't ride on the bus; they are not allowed to."

(By the court) : "Gentlemen, you will not consider the answer, that colored folks are not allowed to ride on the bus."

"I am 56 years old. Lawrence was 39 when he died. He was my oldest son."

The issues submitted to the jury and their answers thereto were as follows:

"1. Did the defendant negligently fail to transmit and deliver the message, as alleged in the complaint? A. Yes.

"2. If so, was the plaintiff injured thereby? A. Yes.

"3. What amount, if any, is the plaintiff entitled to recover by reason of such injury? A. $1,250."

The material assignments of error will be considered in the opinion.

*Morgan & Ward* for *plaintiff*.
*Francis R. Stark* and *Alfred S. Barnard* for *defendant*.

CLARKSON, J. Interstate messages are governed by the Federal rule which does not allow damages for mental suffering, pain or anguish, but only where "injury is done to person, property, health or reputation." It has been the unanimous holding in this jurisdiction that re-

covery can be had for mental suffering, pain or anguish for actionable negligence in the transmission of messages. *Waters v. Tel. Co.*, 194 N. C., 188.

It will be noted that at the close of plaintiff's evidence the defendant rested. There was no motion to nonsuit under C. S., 567. This was a waiver as to the insufficiency of the evidence to be submitted to the jury on the question of negligence. *Murphy v. Carolina Power & Light Co.*, *ante*, 484.

The defendant, in apt time, requested the court below to charge the jury: (1) That upon all of the evidence, if believed by the jury, the plaintiff is not entitled to recover damages, and the jury should answer the second issue "No" and the third issue "Nothing." The court declined and refused to give this instruction, to which the defendant excepted and assigned error. (2) If the jury should find from the evidence, that notwithstanding the negligence of the defendant, the plaintiff by the exercise of due care could have avoided the injury, she would not be entitled to recover damages, and the jury should answer the second issue "No." The court declined and refused to give this instruction, to which the defendant excepted and assigned error. In the court's refusal we think there was no error.

It is well settled that a cause of action does not arise from negligence alone. It must be actionable negligence. The negligence must be the proximate cause or one of the proximate causes of the injury and damage must result. The burden is on the plaintiff to prove this.

"Proximate cause is that which, in natural and continuous sequence, unbroken by any new and independent cause, produces the event, and without which the event would not have occurred." *Hinnant v. Power Co.*, 187 N. C., at p. 295. See *Brewster v. Elizabeth City*, 137 N. C., 392.

The telegram read "Come at once. Lawrence is seriously shot and can't live." The language is clear and unmistakable—it was a death message.

In *Hunter v. Tel. Co.*, 135 N. C., at p. 465, citing a wealth of authorities, it is held: "The second exception is to the refusal of the court to charge that the plaintiff could not recover in the absence of any evidence that the defendant knew or was informed of the peculiar and intimate relations existing between the plaintiff and the deceased child. Such instructions were properly refused, as has been repeatedly held by this Court."

In *Cashion v. Tel. Co.*, 123 N. C., 267, it was held that while the relation of brother-in-law is not sufficiently near to raise any presumption of mental anguish, the actual existence of said anguish, if found as a fact by the jury, would entitle the plaintiff to recover substantial damages. In that case the Court says: "It is true that there are certain

facts which, when proved, presume mental anguish. The tender ties of love and sympathy existing between husband and wife or *parent and child* are the common knowledge of the human race, as they are the holiest instincts of the human heart." *Hunter v. Tel. Co., supra; Lawrence v. Tel. Co.,* 171 N. C., 240.

The defendant contends: "When the plaintiff learned of the contents of the message, and that there had been a delay in its transmission and delivery, the law imposed upon her the active duty to take all reasonable steps to avoid injury. That is to say, when the plaintiff learned from another source that her son had been seriously shot in Asheville, she was obliged to make some reasonable effort to reach his bedside before he died, and if, by the exercise of reasonable diligence, she could have reached his bedside before his death and thereby avoided the injury of which she complains, and she failed to do so, the negligence of the defendant, if any, cannot be regarded as the proximate cause of her injury, for she cannot recover from the defendant compensation for an injury which is attributable to her own negligence."

The court below properly defined negligence, proximate cause and damage. On the above aspect, relied on by defendant, charged the jury: "The court charges you as a matter of law that it was the duty of the plaintiff to do whatever she reasonably could to reduce or lessen the damages or to prevent damages entirely resulting from the failure of the defendant company to deliver the message, and if you find that she got the information from other sources that her son had been injured, and got it in sufficient time that she could, in the exercise of reasonable diligence, have got to his bedside before his death, and could have relieved her mind from all mental anguish resulting from the failure of the defendant company to deliver the message, or could have prevented any mental anguish arising on account of such failure to deliver the message, then it would be your duty to answer the second issue 'No.' I simply mean by that if you find the defendant company was negligent, even so, if you find that the plaintiff got the information as to her son's injury and got it in sufficient time that she could have reached his bedside and not have incurred any mental anguish whatever as a result of the failure to deliver the telegram, then the defendant company would not be liable, and it would be your duty to answer the second issue 'No.'"

We think the charge ample to cover that aspect of the case. In an action for tort committed or breach of contract without excuse, it is a well settled rule of law that the party who is wronged is required to use due care to minimize the loss. *Mills v. McRae,* 187 N. C., 707; *Construction Co. v. Wright,* 189 N. C., 456; *Monger v. Lutterloh,* 195 N. C., 274. The burden is on defendant of showing mitigation of damages. *Monger's case, supra,* at p. 280.

We think there was sufficient evidence to submit the case to the jury on negligence, proximate cause and damage.

The plaintiff, an old colored woman, was living in Waynesville, N. C., about 300 yards from the defendant company's office, and had been living there for ten years. She was at home 27 December, 1926. The death telegram was sent from Asheville, N. C., early that morning—7:33 a.m.—and received at Waynesville at 8:01 a.m. Trains leave Waynesville for Asheville, some thirty-two miles away, at 11 o'clock a.m. and at 5 o'clock p.m. Plaintiff's son died at 6:05 a.m. on the morning of the 28th. Plaintiff went on the 11 o'clock train on the morning of the 28th and got to Asheville some five or six hours after her son had died. Plaintiff's cousin told her the evening of the 27th, after the last train had left Waynesville at 5 o'clock for Asheville, that her son was shot. He saw an account of it in the evening paper. The plaintiff was an old woman, some 56 years old. It rained all night. As to her efforts to get to Asheville, other than by train, she testified: "My sister said she would let us have her automobile, but she couldn't drive it and I couldn't. I went to Asheville to see my son on the first train the next day. I think it was due to leave Waynesville about 11 o'clock, but it was after that when we left. I did not have any other way of getting to Asheville, except on the train." It is a matter of common knowledge that driving an automobile at the best over a mountain road on a rainy night is fraught with danger—liable on such a night to be foggy. This was a matter for the jury in connection with all the facts and circumstances.

Lawrence Gibbs was 39 years old—her oldest son. He often came to see his mother. After being shot between 2 and 3 o'clock on the morning of 27 December he died next morning, the 28th, about 6:05. He was conscious and knew people all the time. Plaintiff, as to her mental suffering, said: "I never felt right about not getting to the bedside of my son before he died, because I think I ought to have seen my child, and I could have seen him if I had gotten the telegram. . . . I just can't stand to talk about it." It was the cry of the old negro mother for her offspring. She was not there to give consolation in the dying hour of her first-born. Her mental suffering cannot, perhaps, be measured in dollars and cents.

On the question of damages, when a general rule is given in the charge correct, it has been repeatedly held by this Court that if defendant desired the charge to be more specific, he must request it by proper prayers for instruction. It may be noted that the exceptions and assignments of error to the charge are not in accordance with the rule of this Court. *Rawls v. Lupton,* 193 N. C., 428.

Defendant, a public service corporation, has promulgated strict regulations, which the courts have ordinarily upheld, and the public doing business with it are bound to obey. It had a fixed charge for a telegram from Asheville to Waynesville and received its fixed price to deliver a death message calling a mother to the bedside of her dying son. Defendant admittedly breached its contract. Defendant says, "An award of twelve hundred dollars in a case of this kind is such as to shock both the reason and the sense of justice of any fair-minded man." The court below duly cautioned the jury: "The defendant says it is true that the plaintiff has suffered sorrow and anguish, but says that has resulted from the death of her son, and not because of any negligence on its part, and I want to caution you right here that in determining plaintiff's damages, if any, you could not allow anything for mental anguish resulting from the death of her son alone, because the defendant company is not responsible for his death; they did not shoot him. You can only consider such mental suffering as was reasonably within the contemplation of the parties and as a consequence of her failure to see her son and talk with him prior to his death, resulting from the failure of the defendant company to transmit and deliver the telegram." The matter of damages was for the jury to determine.

Mental suffering is as real as physical. This is the experience of every normal person. The case was tried with exceeding care in the court below. In law we find

No error.

BROGDEN, J., dissenting.