**LEWIS v. SOUTHERN MILLS, Inc., et al.**

No. 304.

District Court, W. D. North Carolina, Charlotte Division.

Jan. 14, 1944.

---

P. C. Whitlock (of Whitlock & Dockery), of Charlotte, N. C., and Nathan Goldman, of New York City, for plaintiff.

C. A. Jonas (of Jonas & Jonas) and L. E. Rudisill, both of Lincolnton, N. C., for defendants.

TIMMERMAN, District Judge.

This cause was tried by the court without the aid of a jury at the October, 1943, term of this court. Counsel for the parties were allowed to file briefs and proposed findings of fact and law. These have now been filed and have been considered, but neither of the proposed findings has been adopted. Hereinafter the plaintiff may be referred to as "Lewis" or "plaintiff", the defendant Southern Mills, Inc., as "Southern Mills", the defendant M. M. Rudisill as "Rudisill", and the two defendants as "defendants".

### Pleadings

The complaint originally contained five alleged causes of action, but before the trial the second and third causes of action were withdrawn. We are now concerned with only the first, fourth and fifth.

The allegations of the first cause of action may be summarized, omitting formal parts, as follows:

Lewis and Southern Mills entered into a contract on May 5, 1941, whereby Southern Mills agreed to sell and Lewis agreed to buy 85,000 pounds of yarn, at the agreed price of 39¢ per pound, to be delivered in lots of from 2500 to 3000 pounds per week. See plaintiff's "Exhibit 13," Contract No. 266, for full details. This contract may be referred to hereinafter as the "old contract", or simply as "Contract 266".

Lewis and Southern Mills entered into another contract on March 23, 1942, in substitution for and cancellation of Contract 266, whereby Southern Mills agreed

to sell and Lewis agreed to buy 75,000 pounds of yarn, at the agreed price of 62½ cents per pound, to be delivered in lots of 2000 pounds per week, commencing within three to four weeks after execution of contract. Rudisill personally guaranteed the performance of this contract by Southern Mills. See plaintiff's "Exhibit 14", Contract No. 2488, for full details. This contract may be referred to hereinafter either as "new contract" or as "Contract 2488".

Rudisill, acting for himself and Southern Mills, and knowing that Southern Mills would sustain a loss on Contract 266, set about to get relief therefrom, since about 40,000 pounds of the yarn contracted for had not been delivered prior to March 1, 1942. Rudisill approached Lewis about the last mentioned date and offered $12,000 for the cancellation of said contract. Lewis refused the offer, stating that he was more interested in yarn, that he was much in need of it. Rudisill then proposed Contract 2488 and agreed to guarantee the performance thereof by Southern Mills, if Lewis would release his, Rudisill's, associates in the ownership of the stock of Southern Mills from any moral responsibility for the performance of Contract 266, stating that he was on a trade for the purchase of the stock of his associates in Southern Mills and that their release from such moral responsibility was one of the conditions of the trade to be made by him. That Lewis accepted Rudisill's last proposal which resulted in the execution of Contract 2488 and the cancellation of Contract 266.

Rudisill, acting for himself and Southern Mills, induced the cancellation of the old contract and the substitution of the new contract by Rudisill's promise to guarantee Southern Mills' performance of the new contract and by fraud, in that there existed on the part of the defendants a secret intent not to perform the conditions of the new contract and to so manipulate the affairs of Southern Mills as to make it impossible for Southern Mills to perform said new contract or to respond in damages for a breach thereof, which said secret and fraudulent scheme was carried into effect by the selling of all of Southern Mills' machinery and equipment immediately after the new contract was executed.

The price of yarn was at all times, after March 1, 1942, 78¢ per pound. Twenty-two thousand pounds of yarn were shipped on account of the new contract between the effective date thereof and May 7, 1942, and none thereafter. Plaintiff did not know of the alleged fraudulent scheme or the execution thereof until after he had agreed to the new contract. The defendants notified the plaintiff by letter on June 25, 1942, that they were cancelling Contract 2488, but at all times plaintiff insisted on full compliance therewith.

The plaintiff claimed the breach of both of said contracts and damages for each breach, $15,600 for the breach of Contract 266 and $2,015 for the breach of contract 2488, or a total of $17,615.

The allegations of the first cause of action are unnecessarily long and repetitious, and replete with epithets, hence the foregoing is intended only as a very brief summary thereof.

The fourth and fifth causes of action, denominated alternate causes of action, are the same, except that in the fourth damages in the sum of $7,950 are asked against Southern Mills for the alleged breach of Contract 2488 and in the fifth a like sum is asked against Rudisill for the same alleged breach. In these alleged causes of action, the allegations of the first cause of action, paragraphs 1 to 11, inclusive, are adopted as a part thereof.

The defendants filed a joint answer. In it they admitted the execution of both contracts, 266 and 2488; also the giving of notice of cancellation of the new contract on June 25, 1942. They alleged that the causes of said cancellation were plaintiff's representation that he could buy similar yarn to that in question for 2½ cents less than the contract price, or for 60 cents per pound, and that he had a ten-day option to purchase such yarn, and further that the plaintiff had failed and refused to pay for yarn already delivered to him as required by said contract.

The defendants specifically denied all allegations of fraud or lack of good faith in the negotiations leading up to the execution of the new contract or in the performance of the conditions required of them by said contract, as well as the allegations concerning plaintiff's alleged losses by reason of the cancellation of Contract 2488. They alleged that the plaintiff could have, and was in duty bound to have, minimized his alleged loss and damage. In fact the defendants denied all material allegations essential to a recovery.

In addition to answering the complaint, the defendants alleged a counterclaim against the plaintiff for the agreed price of three lots of yarn delivered to plaintiff and not paid for. Their total demand was for $910.43. There being no responsive pleading served or filed, judgment was entered against the plaintiff for said sum.

The foregoing is but a brief, and maybe incomplete summary of the defendants' answer, but it is thought to be sufficient for the purposes hereof.

### The Facts

The following distinct conditions of Contract 2488 should be noted, viz:

"Agreed terms 2% 10 days."

"Delivery: 2000 lbs. weekly beginning three to four weeks."

"Price is adjustment on balance of contract #266 and a new contract of 35,000 pounds. The acceptance of this contract cancels poundage balance on order #266."

"Any complaint must be made in writing within ten days after the receipt of the goods by the purchaser and before the same have been used. The mill has the privilege of replacing within a reasonable time any material not complying with this contract."

"The seller shall not be liable for any special or consequential damages."

"If shipments are changed, delayed or decreased at the request of the buyer or suspended by the seller because of non-payment of overdue bills, either on this or any other contract, it is agreed that such change or suspension shall not affect the validity of this contract. The seller may delay or refuse to make any shipment until all previous shipments have been fully paid for and may at any time require security for payment prior to making any shipment if, in seller's opinion, the circumstances justify it."

"There are no oral understandings or agreements relative to this order that are not fully expressed herein, and this agreement may not be modified or amended except in writing."

"Prices on any undelivered portion of this contract are subject to increase or decrease by the amount that any Federal legislation affects seller's costs."

There is no disagreement about the defendants negotiating for the sale of certain of the machinery of Southern Mills or about actually selling the same, but there is disagreement in point of contention as to whether all of the machinery of Southern Mills was actually sold and as to whether the sale of whatever machinery was sold left the Southern Mills in a position where it could not live up to its contract.

Lewis offered evidence of a list of machinery sold by Southern Mills, but he offered no positive proof that what was sold constituted all of the machinery of Southern Mills. As far as plaintiff's testimony is concerned, that issue is left to conjecture or surmise. On the other hand, Rudisill testified positively: "We retained, out of that sale, the particular machinery that we were making Mr. Lewis' yarn on; it did not go into the sale." Also: "Well, we retained its (Southern Mills') 'stock in process', and cotton on hand, and accounts receivable, at that time." Then at another place: " * * * and the equipment that this yarn was made on was reserved for the purpose of making this order." In addition to the assets above enumerated as having been retained by Southern Mills, it was further testified, without contradiction, that Southern Mills was the owner of one-fourth of the capital stock of the corporation to which was sold such machinery as was sold. Counsel for plaintiff surmises in his reply brief that the stock in the purchasing company was worth $21,250. If this value be added to the value of the other assets retained by Southern Mills there will be a right considerable estate. In view of the fact that it was further testified that all of the debts of Southern Mills were paid out of the sale of whatever machinery was sold, the conclusion is inevitable that the assets of Southern Mills were not so dissipated as to leave the plaintiff "unable to compel enforcement of the contract or (to) collect damages for the breach thereof", as charged in the complaint.

Since plaintiff predicates his charge of fraudulent intent on the further charge that the defendants actually accomplished their intent, and the accomplishment of the intent not being established, the whole charge in point of fact fails.

For the purpose only of a further consideration of the evidence, let it be assumed that the charges of fraud are established. In that situation and in view of other facts, where does the plaintiff stand? Rudisill testified that he went to New York, where Lewis lives, and told Lewis prior to May

16, 1942, that he was moving the retained machinery to a new site so he "could continue furnishing him yarn—and he says he doesn't remember anything about it—but he knows all about it because I discussed it with him; he even went so far as to discuss about taking an interest with me; and he told me, out of his own mouth, that his banker wouldn't loan him money to put in the mill." Rudisill also said he didn't tell Lewis about his plans to sell the machinery of Southern Mills before March 23, 1942. If he told him, as he says he did, then it was between March 23, and May 16, 1942. Lewis denied Rudisill's statement, thereby making a clear-cut issue between them.

I am constrained to resolve the issue in Rudisill's favor for these reasons: (a) Lewis was most equivocal in his testimony; he avoided committing himself and persisted in argumentative answers in response to questions asked him, even in response to the few questions asked him by the court; and (b) he admitted writing a letter to the defendants on June 24, 1942, after a phone conversation with Rudisill, in which he stated that he had a ten-day option to purchase similar yarn to that in question from another concern. He urged that as a reason why the defendants should give him a prompt reply to his proposal to cancel Contract 2488 for a cash consideration to be paid to him. When he was testifying in open court, Lewis said his written statement about having the mentioned option was a pure fabrication. He thereby discounted his testimony. I have little faith in the sworn testimony of a person who will prevaricate in his ordinary business dealings with others.

Besides, the testimony conclusively shows that the defendants, on the plaintiff's insistence, were far ahead of deliveries under Contract 2488 when Lewis refused to pay for some of the yarn he had received and 2000 pounds ahead on the date of the alleged cancellation of said contract. This and the other facts mentioned do not tend to establish the allegations of fraud; on the contrary they tend to negative them.

While Lewis denies that Rudisill informed him of the machinery sale between March 23, and May 16, 1942, as Rudisill testified he had done, he admits that he gained knowledge thereof the latter part of June, after June 24, 1942. Notwithstanding this knowledge he wired the defendants on June 29, 1942, as follows: "Have called you several times but it was reported that you cannot be reached stop please answer our letter of June 24 must settle this matter in the next few days stop advise whether you will be able to ship yarn shortly or whether you will settle in accordance with our letter". (Plaintiff's "Exhibit 18").

Then, on June 30, 1942, he wrote the defendants as follows:

"* * * we would ask you to please fill our contract in accordance with the original agreement, and we trust that this will be satisfactory to you.

"Please note, in accordance with our agreement, you are to deliver this yarn to us at the rate of 2000 pounds weekly, and we hope that you will be in a position to do so in the very near future. Our records show that there is now a balance due us of 53,045 pounds due against contract #2488.

"Please advise when you will again commence shipping against the above mentioned contract." (Plaintiff's "Exhibit 21").

If the foregoing telegram and letter do not amount to a reaffirmation of Contract 2488, after admitted knowledge of the alleged fraud, then certainly Lewis' wire of July 28, 1942, did amount to such reaffirmance. It reads as follows: "In your letter of June 25 we can definitely read contempt and misrepresentation on your part stop unless we hear from you in five days advising when you will resume shipments against defaulted contract 2488 we will be compelled to start proceedings". (Plaintiff's "Exhibit 22").

There are other matters in the record that do not recommend Lewis. He blows hot and cold, and makes contentions that apparently are utterly without foundation. In March of 1942 he took the position that he was interested—not in money—only in yarn. That was when Rudisill offered him $12,000 to cancel Contract 266, which in the light of the testimony as developed on the trial was at least $2,000 more than any loss he could have sustained by the cancellation, in the absence of a showing of special circumstances warranting a different conclusion. He explained this attitude by saying he was then much in need of yarn. So he took the new contract, with Rudisill's guarantee thereof, in preference to the cash consideration offered, and thereby obtained a contract for 35,000 pounds of additional yarn albeit at a price in advance of the old

contract price. There is no evidence that, after the acceptance of the new contract, Lewis purchased a single additional pound of yarn, yet in June following, about three months after the execution of the new contract, we find Lewis trying to get a cash consideration for the cancellation of the old contract which he had previously cancelled in consideration of the execution of the new contract. See Lewis' letter of June 24, 1942, plaintiff's "Exhibit 20". It is true that in this belated effort to get cash, he offered to accept slightly less than had been originally offered him, but he based his demand for a cash settlement on two specious hypotheses and on an ironical offer of liberality to give credit on the cancelled contract for yarn delivered on the subsisting contract. His first hypothesis is that Contract 266 had not been cancelled by the substitution of Contract 2488 therefor. And here it should be borne in mind that at this time Lewis had advanced no claim of fraud in the procurement of Contract 2488 and that he testified he didn't know of the alleged facts on which he later predicated his charges of fraud until several days later. His second hypothesis is that the price of yarn was 78 cents per pound. It is now established beyond all question that the price of yarn at all relevant times was 63.32 cents per pound. All of this suggests shenanigan, for I am convinced, notwithstanding Lewis' protestations to the contrary, that he knew the ceiling price of yarn and that he knew he had already cancelled Contract 266 and had substituted Contract 2488 in its place. I am so convinced, first, because it is inconceivable that Lewis could have operated a commercial business without knowing the price of the article in which he was dealing, and, second, because he undoubtedly knew the terms of the written contract which he had negotiated and executed.

Lewis sought to excuse his alleged prior breach of Contract 2488 by charging that the yarn he failed to pay for was defective, or didn't meet the specifications of the new contract. He undertook to substantiate this position by testifying that some of the yarn was shipped to a customer who had turned it down. Suppose a customer of Lewis did turn some of the yarn down, that of itself proves nothing. Lewis didn't produce his contract with his customer, or even a specimen of the alleged off-grade yarn. For aught the record shows Lewis

may have sold his customer a grade of yarn entirely different from the grade he purchased from defendants, or the customer may have been attempting to "put something over" on Lewis. Besides, as shown hereinbefore, the contract requires any complaint concerning goods delivered under the contract to "be made in writing within ten days after receipt of the goods by the purchaser and before the same have been used". There is no pretense on the part of the plaintiff that this requirement of the contract was followed. Plaintiff admittedly used the goods—actually sold them to a customer—before any complaint, in writing or otherwise, was made. He thus placed the goods beyond the inspection range of the defendants, while demanding that they accept his unsupported claim of defective yarn.

One of the important considerations moving Lewis to execute Contract 2488 was Rudisill's personal guarantee that Southern Mills would perform its part thereof, yet there is neither contention nor proof that Rudisill is not financially responsible for the obligation thus assumed; nor is there any charge that the plaintiff was induced to enter into said contract by false and fraudulent representations as to Rudisill's financial responsibility and worth.

Lewis has not shown what, if anything, he did to minimize his damages; and from the testimony I conclude he did nothing. It is true that Lewis testified he did purchase yarn at 73 cents per pound to take the place of yarn not delivered under Contract 2488 on his direct examination, but it developed on his cross-examination that the yarn he referred to as having been purchased to take the place of that not delivered under Contract 2488 was in fact contracted for in 1941, long before the contract in question was even thought of. This is further evidence of Lewis' lack of candor. Besides, Lewis offered no substantiating evidence of his bald declaration; no contract, invoice or other document was produced to show that the plaintiff had contracted to pay or had paid 73 cents per pound at any time for yarn of the kind here in question, or for any other kind. When Lewis was being cross-examined about this very matter, here is what transpired:

"Q. Mr. Lewis, you say that you paid seventy-three cents (73¢) per pound for yarn to replace what you did not get on

Contract 2488—is that right? A. Not exactly 'what I did not get'; I bought this yarn continuously * * *

"Q. (Interposing:) Just listen to me! Did you pay seventy-three cents (73¢) per pound for yarn with which to replace that portion on this contract which was not delivered? A. Yes.

"Q. To whom? A. To Shawmutt Mills.

"Q. When? A. There are the contracts —I can't remember the dates, exactly; in the Summer of '42.

"Q. In the Summer of 1942? A. I don't remember the dates.

"Q. How much did you buy? A. I bought fifty five thousand (55,000) pounds, between some date in '41 and the same date in '42.

"Q. Did you buy it all at one time? A. No; there was one contract for forty thousand (40,000) pounds, one for 'ten' (10,000 lbs.), and one for 'five' (5,000 lbs.)

"Q. Did you buy any more from them? A. All from the same Company.

"Q. And you bought still other yarn than that enumerated, too, didn't you? A. No."

The testimony just quoted is typical of the equivocations that characterize Lewis' entire testimony.

Further it may be noted that there is no substantial evidence that Lewis lost anything by reason of the cancellation of Contract 2488 on June 25, 1942, unless his bald declaration that he paid 73 cents per pound for yarn to take the place of that not delivered under Contract 2488 be accepted. I cannot accept that statement for the reasons hereinbefore stated. Besides, Rudisill testified that Lewis told him he could purchase the yarn at 60 cents per pound. Lewis denied making that statement. If Lewis made that statement, and if it were a true statement, then he had an opportunity to gain rather than lose by the cancellation of Contract 2488. If it be assumed that Lewis didn't make the statement, or that it was untrue if he did make it, then one is prompted to wonder why Lewis, before he had any reason to suspect the fraud he alleges, would be endeavoring to get a cash consideration for the cancellation of Contract 2488, a contract which he contends was so highly profitable and essential to the conduct of his business. In view of Lewis' admission that he made one deliberate misstatement to the defendants in his effort to get cash for cancelling

said contract, I am inclined to resolve this issue of fact against him.

By way of summary, I find as matters of fact:

1. That on and after March 23, 1942, the only subsisting contract between the parties was Contract 2488.

2. That the plaintiff has failed to carry the burden of proof on the issues of fraud and fraudulent concealment mentioned in the complaint.

3. That the plaintiff induced the cancellation of Contract 2488, (a) by his assertions of rights under the prior cancelled Contract 266; (b) by his representation to the defendants that he had an option for ten days to purchase yarn of the kind contemplated in Contract 2488 at 60 cents per pound, that is at 2½ cents per pound below the contract price; and (c) by his prior breach of said contract, in wrongfully refusing to pay in accordance with the contract for yarn that had been delivered to him more than a month and a half before, and at a time when the defendants, on his insistence, were well ahead on their contract deliveries.

4. That the plaintiff made no reasonable effort to minimize his damages, if any.

5. That there is no substantial evidence establishing any loss, which is determinable, sustained by the plaintiff by reason of the cancellation of Contract 2488, even if said cancellation be considered wrongful.

6. That the plaintiff reaffirmed Contract 2488 after admitted knowledge of the facts on which he finally based his allegations of fraud and fraudulent concealment.

7. That the plaintiff's allegations that 78 cents per pound was the basic price of yarn at the times here in question is utterly without foundation or support.

8. That the true ceiling price of yarn of the character here in question was, at all relevant times, 63.32 cents per pound.

9. That at the time of the claimed wrongful cancellation of Contract 2488 by the defendants, the plaintiff had already breached said contract by failing or refusing to pay for yarn delivered to him thereunder, and he was in arrears and in breach of said contract on the date this action was commenced.

### The Law

The two positions taken by Lewis in the first alleged cause of action are so

patently contradictory that they cannot stand together. In one he would avoid Contract 2488 and restore Contract 266; and in the other he would retain Contract 2488 for the purpose of asserting a cause of action for its breach. He cannot do both; he must hold to the one or the other. A party to a contract may not rescind it in part; he must either reject it or accept it. May v. Loomis, 140 N.C. 350, 359, 52 S.E. 728, 731. If the last contract (2488) was entered into validly, then by its plain terms it effectively cancelled the first one (266). If, on the other hand, the new contract was induced by a fraudulent promise, coupled with the fraudulent concealment of a material fact, then it is the province of equity to grant relief from said contract.

Since the fourth and fifth alleged causes of action, denominated alternate causes of action in the complaint, are predicated upon the affirmance of Contract 2488 and an alleged breach thereof, the first cause of action will be treated, first, as one, arising in equity, for relief from the consequences and obligations of Contract 2488, and, second, as one at law for damages for the breach of Contract 266. This seems to be the construction of the first cause of action most favorable to the plaintiff.

▮ Assuming the stated construction of said cause of action to be correct, the first question to arise is: Was the execution of Contract 2488 by the plaintiff, and the consequent cancellation of Contract 266, induced by a fraudulent promise, coupled with the fraudulent concealment of a material fact? In considering this question it should be noted that Lewis contends that he was induced to cancel Contract 266 and to substitute Contract 2488 in its stead by the fraudulent promise of the defendants that the obligations imposed on them by Contract 2488 would be fully performed, while secretly intending not to perform said contract obligations, but to so render the affairs of Southern Mills as to make a judgment against it for a breach of said contract utterly valueless.

The question posed must be answered in the negative. The evidence does not warrant the inference that the defendants made a promise that they secretly intended to breach in fraud of plaintiff's rights. The promise here in question appears on the face of the contract; it is an incident or part and parcel of the contract. There is no evidence of fraud arising out of the mere making of a promise or the mere assumption of an obligation to be performed in the future. Of course the failure to keep a contractual promise or the breach of a contractual obligation, without lawful excuse therefor, may subject the defaulting party to an action for damages, but the mere breach of a contract, nothing more appearing, will not warrant the inference of fraud in the procurement of the contract. It takes much more evidence to establish fraud, for fraud is something not lightly to be imputed. Hill v. Gettys, 135 N.C. 373, 47 S.E. 449, cited with approval in Planters' Bank & Trust Co. v. Yelverton, 185 N.C. 314, 117 S.E. 299, 301.

To be sure, as pointed out in the foregoing cases, a promise may become an instrument of fraud if it is used as a means of deception "with no intention of performance", but as shown hereinbefore the facts of this case do not warrant that inference. At the time of the alleged and admitted cancellation of Contract 2488 the defendants were ahead on performance of the conditions of said contract required of them while the plaintiff was in default. If it should be held that the simple breach of a contract is evidence of fraud, then the plaintiff would stand convicted thereof.

▮ As evidence of the fraud alleged, the plaintiff relies on proof of undisclosed negotiations for the sale of certain machinery of Southern Mills and the actual sale thereof. He infers from those facts that all of the machinery of Southern Mills was sold, and then on that surmise he infers that Southern Mills was placed in a position where it would be immune to a judgment for a breach of its contract. These have been shown to be fallacious assumptions. Moreover, there is no contention that Rudisill, the guarantor of Southern Mills' performance, is not entirely solvent, or that he could not be made to respond to a judgment for damages. Then, too, it is unreasonable to assume that Rudisill would have intentionally created a condition that would make him liable on said contract.

[6] There is another reason why plaintiff is not entitled to a rescission of Contract 2488 and the reinstatement of Contract 266. If the testimony of Rudisill be accepted, and I am inclined to accept it for reasons already stated, then Lewis knew of the facts on which he bases his right to

rescission many months before this action was commenced and during the interim before bringing this suit he repeatedly and insistently reaffirmed and ratified said contract, calling either for full performance or the payment to him of a cash consideration for its cancellation. On the other hand, if Lewis' own statement be accepted as true, he reaffirmed and ratified Contract 2488 from one to three times after he obtained knowledge of the facts relied on by him for rescission and before this action was instituted.

"Where a party, with knowledge of facts entitling him to rescission of a contract or conveyance, afterward, without fraud or duress, ratifies the same, he has no claim to the relief of cancellation. An express ratification is not required in order thus to defeat his remedy; any acts of recognition of the contract as subsisting or any conduct inconsistent with an intention of avoiding it, have the effect of an election to affirm. This doctrine seems to rest not upon the principle of a new contract between the parties, nor yet upon the ordinary principle of estoppel in pais, but rather upon a distinct principle of public policy, that all that justice or equity requires for the relief of a party having such cause to impeach a contract is that he should have but one fair opportunity, after full knowledge of his rights, to decide whether he will affirm and take the benefits of the contract, or disaffirm it and demand the consequent redress. Any other rule would be regarded as unjust, even toward the party guilty of the wrong out of which grows the right to rescind.'" 9 Corpus Juris, Sec. 77, at p. 1198. See also, 12 C.J.S., Cancellation of Instruments, § 38.

Mr. Justice Brewer in McLean v. Clapp, 141 U.S. 429, 432, 12 S.Ct. 29, 30, 35 L.Ed. 804, cited with approval the following quotation from Grymes v. Sanders, 93 U.S. 55, 62, 23 L.Ed. 798: "'Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted. These remarks are peculiarly applicable to speculative property like that here in question, which is liable to large and constant fluctuations in value. Thomas v. Bartow, 48 N.Y. [193], 200; Flint v. Wood, 9 Hare, 622; Jennings v. Broughton, 5 De G. M. & G. 139; Lloyd v. Brewster, 4 Paige 537 [27 Am.Dec. 88]; Saratoga & S. R. R. Co. v. Row, 24 Wend. 74 [35 Am.Dec. 598]; Minturn v. Main, 3 Seld. 220, 7 N.Y. 220; 7 Rob.Pr. c. 25, sect. 2, p. 432; Campbell v. Fleming, 1 Ad. & El. 41; Sugd. Vend. (14th Ed.) 335; Diman v. Providence, W. & B. R. R. Co., 5 R.I. 130.'"

See May v. Loomis, 140 N.C. 350, 359, 52 S.E. 728, 731; McNair v. Southern States Finance Co., 191 N.C. 710, 133 S.E. 85.

■ It follows that if the plaintiff is not entitled to a rescission of Contract 2488 he can claim nothing under Contract 266, since all that was left of the old contract was merged into the new contract.

■ The two alternate causes of action, the fourth and fifth, affirm Contract 2488. In them, damages are asked for the alleged wrongful breach of Contract 2488. If in fact Southern Mills did wrongfully breach said contract, then it would be liable for all damages naturally flowing therefrom. And it would follow that Rudisill would be liable on his guarantee if Southern Mills failed to satisfy the damages it had caused, but the plaintiff would not be entitled to two satisfactions for the same wrong. Hence the primary and controlling question for consideration is: Did Southern Mills wrongfully breach Contract 2488?

■ The ultimate answer to the question stated depends on several considerations. First and foremost, one party to a contract cannot maintain an action against the other party for breach thereof if he has breached the contract himself. As has been shown, the plaintiff was in arrears for yarn delivered to him under said contract, without evidencing any intention to pay therefor except on terms dictated by himself, at the time Southern Mills cancelled the contract, and he was still in arrears at the time he commenced this suit and continued so until the trial. There is no contention that the contract was cancelled before plaintiff breached it by failing to pay for yarn delivered to him more than a month and a half before.

The respective obligations of the contract were in a sense dependent. The defendants were to deliver yarn and plaintiff was to pay for it. The defendants delivered the yarn; the plaintiff did not pay for it. The plaintiff, therefore, has no right to require the defendants to either continue shipping him yarn or pay damages for not doing so. In the vernacular, the plaintiff is asking for "a gravy train".

 As has been shown, no valid excuse existed for plaintiff's refusal to pay for yarn already received. One party to a contract who, without valid excuse, fails in the performance of his part of the contract cannot maintain an action against the other party because he thereafter refuses to continue performance. Raybestos-Manhattan, Inc., v. Asbestos Textile Co., 1 Cir., 79 F.2d 634, 637; Penley Bros. Co. v. Hall, 1 Cir., 84 F.2d 371, 374.

"One party to a contract cannot maintain an action for its breach without averring and proving a performance of his own antecedent obligations arising on the contract, or some legal excuse for a non-performance thereof * * *." Edgerton v. Taylor, 184 N.C. 571, 115 S.E. 156, 159.

See, also, Everett B. Clark Seed Co. v. Jennette Bros. Co., 195 N.C. 173, 141 S.E. 542; Wade v. Lutterloh, 196 N.C. 116, 144 S.E. 694.

Furthermore, "In an action for * * * breach of contract without excuse, it is a well-settled rule of law that the party who is wronged is required to use due care to minimize the loss." Gibbs v. Western Union, 196 N.C. 516, 146 S.E. 209, 213, and cases cited.

The failure of the plaintiff to show that he made any reasonable effort to minimize his alleged loss, or any valid excuse for doing so, is another reason why he is not entitled to recover.

 Finally it may be said, on the assumption that the plaintiff has shown a wrongful breach of said contract, that he has offered no substantial or credible evidence by which the court can fix any definite sum as the damages sustained. No claim to nominal damages has been asserted.

From what has been said it follows that the complaint should be dismissed and that the defendants should have judgment for their taxable costs, as well as judgment on their counterclaim; and it is so ordered.