13035

PAUL v. SOUTHERN RAILWAY CO.

(155 S. E., 884)

April, 1930.

*Messrs. McDonald, Macaulay & McDonald* and *Frank G. Tompkins,* for appellant,

*Messrs..Hemphill & Hemphill,* for respondent.

November 26, 1930.

The opinion of the Court was delivered by Mr. Justice Blease.

The plaintiff, a colored woman, sued the defendant railway company, and alleged in her complaint, briefly stated, that she, accompanied by two infant children, became a passenger from Chester to Charlotte on one of defendant's passenger trains; that a short time after the train left Chester the conductor, after taking up her ticket inquired of plaintiff the ages of her two children, demanded of her a ticket or cash fare for the oldest child; that thereupon plaintiff tried to explain to the conductor that the only reason that she had not procured a ticket for the older child was because she did not know she was required to pay for him, and started searching for such money as she had with her to offer to pay for the fare of the child; that the conductor refused to listen to any explanation, refused to wait to see how much money plaintiff had, but did in a harsh, insulting, and threatening manner demand that plaintiff and her two children get off the train, and notwithstanding the fact that plaintiff did beg and plead not to be put off and offered to pay all the money she had, the conductor did, in high-handed disregard of plaintiff's rights as a passenger, recklessly, insultingly, willfully, wantonly, summarily, and improperly drive and eject plaintiff and her two children from the train, in an improper, out-of-the-way and dangerous place at a railway

crossing in a deep and dark cut about one mile north of defendant's Chester station, and into the midst of a terrific rain and thunder storm; that plaintiff was terribly frightened and shocked, was almost immediately drenched to the skin, was insulted, abused, had her clothing damaged, was made sick and thereby caused loss of time from her work, put to expense of medical treatment, suffered pain, annoyance, and inconvenience, all to her injury and damage in the sum of $2,999.99.

The answer of the defendant contained a general denial, except the admissions that the defendant was a common carrier, as stated in the complaint, that the plaintiff purchased a ticket at Chester, S. C., on or about the 24th of June, 1929, good for her transportation from Chester, S. C., to Charlotee, in the State of North Carolina, and that the paid the regular fare therefor, and was accompanied by two of her infant children and that she boarded one of defendant's passenger trains on said date at Chester. Defendant further admitted that plaintiff was ejected from said passenger train a short distance above its station at Chester, but alleged that said ejection was due to the facts and circumstances later set forth.

As a defense, the defendant alleged that it was a carrier of passengers and freight in interstate commerce; that it had filed its schedules and traffics or rates for transportation of passengers and freight and of all privileges or facilities granted or allowed to it by the Interstate Commerce Act (49 U. S. C. A., § 1 et seq.) ; and it further alleged that the children of plaintiff, under the provisions of said schedule and tariff, were liable for the payment of one-half fare, they being over the age of five years. The defendant further alleged that plaintiff, failing or being unable to pay said fares for her infant children, was put off of said train without any force or violence and without any harshness, impoliteness or rudeness at a distance of not more than one-half mile from its station of Chester, and that defendant's agent and conductor so ejected the plaintiff solely for the reason

that he could not transport the plaintiff and her children upon the ticket held by the plaintiff for her own transportation, as it would have subjected the defendant to the charge of unlawful discrimination, as well as heavy penalties, and that to have done so, would have been an express violation of the Act of Congress relating to interstate commerce and of the tariffs and schedule of rates provided by the Interstate Commerce Commission.

The case came on for trial in the Court of Common Pleas for Chester County before Judge S. W. G. Shipp and a jury on the 2nd day of April, 1930.

At the close of all of the testimony, the defendant made a motion for a directed verdict in its favor as to both actual and punitive damages upon the grounds hereinafter mentioned. This motion was refused by Judge Shipp. A verdict for $125.00 actual damages ,and $200.00 punitive damages, was returned by the jury in favor of the plaintiff.

From the adverse verdict and judgment, the defendant has appealed to this Court. The exceptions make no complaint as to the admission or rejection of any evidence; and no error is imputed because of any instruction of the presiding Judge to the jury. As a matter of fact the appellant's counsel have said in their argument that they did not ask for a new trial of the cause. They insist that a directed verdict in favor of the appellant should be entered up by this Court as to both actual and punitive damages, and certainly as to the latter.

The positions of the appellant, as indicated by the grounds of the motion for a directed verdict, the exceptions to this Court, and in the argument of counsel, raise the following questions for our determination:

1. That there was error in not directing a verdict as to actual damages on the ground that there was no evidence in the case showing any breach of duty or negligence on the part of the defendant in ejecting the respondent and her two children.

2. That there should have been a directed verdict as to punitive damages upon the ground that there was no evidence on the whole case showing any willful or reckless act on the part of appellant's agents and servants in the ejection.

3. That a verdict as to both actual and punitive damages should have been directed upon the ground that the action was governed by the Interstate Commerce Act of Congress, and upon the refusal of respondent to pay one-half fare for one of her children she and said children were rightfully ejected from appellant's passenger train, and no damages could be awarded against the appellant for complying with that Act of Congress.

4. That the action being governed by the Interstate Commerce Act of Congress, it was error not to direct a verdict as to punitive damages upon the grounds that there was no evidence in the case of any wrongful or willful act, and if there had been such evidence there was absolutely no evidence showing ratification of the conductor's acts by the appellant.

In considering the questions made by the appellant, we are faced with the concession of its counsel, as already indicated, that the presiding Judge correctly charged the jury as to the law involved in the case. Without attempting to quote at length from the instructions he gave, we call attention, however, to the main legal principles declared by him.

Because of the admission of the respondent that she had not purchased a ticket for one of her children, above the age of five years, who accompanied her, and since she did not tender the proper fare for the transportation of that child, as required by the schedule and tariffs of rates and fares of the appellant, approved by the Interstate Commerce Commission, the jury was instructed that the appellant railway company had the right to refuse to convey the respondent and the children and to eject them from the train.

But, in that connection, the jury was told that the ejection should have been done at a proper place and in a proper manner; that the respondent and her children, in being discharged, should have been treated in a courteous manner; and that the place of discharge should have been reasonably safe, depending upon the conditions and circumstances then existing.

The jury was also instructed that the case was governed by the Federal law, and before a verdict for punitive damages could be awarded, there must not only be proof of some willful or reckless act on the part of the conductor in ejecting the respondent and her children, but that there must also be some evidence that satisfied them of ratification of the conductor's acts by some "higher officers of the company."

As to the question of actual damages, we think it does not differ that the cause be controlled by either the State or Federal law, for the principles applicable are the same in both jurisdictions: In this jurisdiction, the applicable principle, followed many times since, was announced as far back as 1887 in the case of *Hall v. Railway Co.,* 28 S. C., 261, 5 S. E., 623, 625, where the Court used the following language: "We are not prepared to lay it down as a rule of law that where a passenger on a railroad train refuses to pay his fare, the conductor cannot eject him between stations, but is bound to take him on to the next regular station before he can be ejected. It seems to us that this would depend largely upon the circumstances of each particular case. For example, in this very case, where the passenger, finding that he was to be ejected desired to be put off at a point near his home, where the train might have been easily stopped, as was shown by the fact that the train had been in the habit of stopping at that point, near the Highland Park Hotel landing, and the conductor refused to do so, but insisted on carrying him to the next station five miles further on, where as the

conductor must have had reason to know and where the event proved, there was no shelter at that early hour of the morning to which the plaintiff could obtain access, the state of the weather being such as to render it necessary for plaintiff's comfort, we would not be willing to lay it down as a rule of law that the plaintiff. could only be ejected at the next station. On the contrary, we think with the Circuit Judge, that there were circumstances proper to be considered by the jury in determining the qeustion whether exemplary damages should be awarded."

In the case of *Moore v. Railway Co.*, 38 S. C., 1, 16 S. E., 781, it was held: "The conductor may put off a passenger who refuses to pay the fare for transportation, at any point of the road where the passenger would not be injured or endangered." Syllabus.

In the Federal jurisdiction, the Supreme Court of the United States has made this declaration: "A carrier by rail is liable to a trespasser or to a mere licensee willfully or wantonly injured by its servants in charge of its train (Commentaries on the Law of Negligence, Thompson, §§ 3307, 3308 and 3309, and the same sections in White's Supplement thereto), and a sound public policy forbids that a less onerous rule should be applied to a passenger injured by like negligence when lawfully upon one of its trains. This much of the protection was due the plaintiff as a human being who had intrusted his safety to defendant's keeping." *New York Central Railroad Co. v. Mohney*, 252 U. S., 152, 40 S. Ct., 287, 289, 64 L. Ed., 502, 9 A. L. R., 496.

The general rule is stated in Corpus Juris as follows: "While the rule is by no means of universal application, it is well settled in many jurisdictions that carriers of passengers are liable for the acts of their servants or agents resulting in injuries to passengers, whether willful and malicious or not, and whether done in the line of their employment or service or not, if done during the course of the dis-

charges of the duty which their employers owe to the passengers; and this rule applies to the wrongful acts of any agent or servant employed in the general business of transportation." 39 C. J., 1287.

The rule as to willfulness and punitive damages therefor is not the same in this jurisdiction as that recognized in the Federal Courts, and this has been pointed out by this Court in *Johnson v. Railroad Co.*, 142 S. C., 125, 140 S. E., 443, 447, where we said: "While the Federal decisions have been to the effect that, before the master can be held liable for the willful tort of his servant, there must be evidence that he had authorized or ratified the wrongful act; it has been frequently held in this State that the master is liable for the servant's willful tort, when the servant is acting within the scope of his authority and duties, although there may not have been a direct authorization or raitfication."

Accepting here the legal principles depended upon by the appellant, as they were recognized also by the trial Judge in the lower Court, we consider the evidence adduced in favor of the respondent for the purpose of ascertaining if it entitled her to have her case submitted to the jury.

Respondent, a Negro woman, lived in a rural community of Chester County, had little, if any educational advantages; her avocation was that of servant and cook, and she had had little experience in traveling on railroad trains. She knew nothing, of course, as to rules and regulations of the Interstate Commerce Commission and of tariffs and rates for transportation of passengers. She desired to go to Charlotte, N. C., where her husband had employment, and where also she could obtain employment as a cook. With her two little children, one under five years of age and the other a little above that age, she went to the railway station at Chester for the purpose of becoming a passenger on the appellant's train. Being of the impression that she did not have to purchase a ticket for

either of her children, she applied for, and purchased a ticket from Chester to Charlotte for herself. The ticket agent, if he saw the children, and it is likely he did, did not make any suggestion to her that she should purchase a ticket for either of them. With the ticket for herself in her possession, and with her children, bundles, and bags, she boarded the train. When the conductor, in the performance of his duty of taking up tickets, reached the place in the coach where the respondent and her children were seated, he inquired of the respondent as to the ages of the two children, and upon learning that one of them was above the age of five years, he informed the respondent that she could not ride unless she paid fare for that child. The respondent had with her the sum of 40 cents only, an amount entirely insufficient to pay the child's passage from Chester to Charlotte. The conductor told her that she and her children would have to leave the train. The train was immediately stopped, and the respondent and her children, with the bags and bundles, were discharged. According to the respondent's testimony, which was corroborated by other witnesses, the time was late in the afternoon, almost night, the place of discharge was in a deep cut near a railroad junction, heavy dark clouds were in the skies, thunder and lightning were about, and rain was falling. Respondent said to the conductor, as she testified, "Please don't put us down in the storm." After the ejection, the train moved off. The respondent with her bags and bundles and the two little boys made her way back to the station at Chester, walking the railroad track, in a hard rain. One of the little boys fell on the way, and the respondent could not assist him much because of the bundles she carried. At the station, wet and bedraggled, her new green hat, bought especially for the Charlotte trip, ruined forever, she began to think of what she and her children would do for the night, and she asked the ticket agent to take back her ticket and refund her money so that she might use it in securing a lodging place. Her request

for the return of her money was refused because the agent had sent off his collections for the day on the same train which the respondent had endeavored to ride. Respondent then sought a place to spend the night, and a "Good Samaritan" of her own race gave shelter to her and her children, and the wife of the "Good Samaritan" gave them dry clothes. Respondent later secured the necessary money to pay the fares of her child and herself from Chester to Charlotte, but upon her arrival in that city she was ill, in which condition she continued for several weeks, resulting in medical expenses and doctors' bills, occasioning loss of her employment as a cook.

Under our well-recognized rules, the evidence in behalf of the appellant matters little, but, in justice to the conductor of the train, it is proper that we at least make the general statement that there was some evidence showing that the place where the respondent and her children were discharged was a safe place, and there was not, so far as the conductor could see, at the time indications of the impending storm.

The statement of the evidence we have given certainly was sufficient to require the Circuit Judge to submit the question to the jury as to actual damages.

The only difficulty in the appeal relates to the matter of punitive damages. If the case were controlled by the decisions of this Court, there could be no question about the matter, but it appears to be conceded that we must follow the rule of the Federal Courts. The evidence was entirely sufficient, even under the Federal rule, to require a submission of the case to the jury as to the willful or reckless acts of the conductor, if there was any evidence to show ratification of those acts by the railway company.

Defining "ratification," a standard text-book says this: "The act of giving sanction and validity to something done by another; the adoption by a person as binding upon him-

self of an act done in such relations that he may claim it as done for his benefit, although done under such circumstances as would not bind him but for his subsequent assent: *the approval by act, word, or conduct,* of that which was attempted (of accomplishment) but which was improperly or unauthorizedly performed in the first instance." (Italics added.) 33 Cyc., 1528.

The question is, then, was there any evidence to go to the jury showing that the appellant approved, "by act, word or conduct," the willful act of the conductor in ejecting the respondent from the train at a time and place held to be improper and unsafe by the verdict of the jury?

The Circuit Judge, on the motion for a directed verdict, thought there was sufficient evidence of ratification on the part of the company, for the reason that it appeared "that the conductor is still the conductor"; that is, the company had retained him in its employment. We doubt if we can agree with this holding of the Circuit Judge if we follow strictly the rule announced by Mr. Justice Cothran for this Court in *Mann v. Life & Casualty Insurance Co. et al.,* 132 S. C., 193, 129 S. E., 79, 80..In that case, the learned Justice, whose views were concurred in by a majority of the Court, spoke of the harshness of the rule "that the retention of a servant who has committed a tort within the scope of his employment, after discovery by the master of such tort * * *" was evidence of ratification by the master of such tort. He said, and his holding was also agreed to by a majority of the Court, that: "It [the rule mentioned] certainly does not apply where the master has no knowledge of the tort." And the principle announced in the *Mann case* seems to be in accord with the rule generally recognized for we find in Corpus Juris this statement: "There can be no ratification by the master without notice of the servant's misconduct. Hence, evidence of the mere retention of a servant after the commission of the wrong complained of is

not sufficient to authorize an inference or ratification on the part of the master, without proof also of his knowledge of the nature of the servant's act." 17 C. J., 193.

In the case at bar, without doubt, the conductor was retained in the employment of the company after the occurrences resulting in, and surrounding the ejectment of the respondent.

And while the evidence going to show that some of the conductor's superior officers had notice or knowledge of what had occurred was not very strong, still we are of the opinion that such evidence was sufficient to take the case to the jury on the question of knowledge or notice. The conductor himself testified that, at some time or other, the exact date not appearing in the transcript of his testimony, he made a report of the occurrence to the superintendent of the Columbia Division of the appellant company. It was for the jury to say if the report was made soon after the happening of the ejectment, for they perhaps, as good business men, knew that a railway conductor is required to make reports of unusual occurrences while he is in charge of his train as to the ejectment of passengers.

Another thing that influences us somewhat to hold that there should be much liberality as to the establishment of ratification on the part of a large corporation, as to the acts of its servants, is due to the fact that it is very difficult for a stranger to the inner workings of the affairs of a corporation to show positively that the higher officers of the corporation had notice of the willful act of some servant. So, even if the Circuit Judge did not, in his remarks on the motion for directed verdict, state fully the rule of the *Mann case,* we nevertheless, think that he followed the rule there declared, and accordingly, his refusal to grant the motion was correct.

The judgment of this Court is that the judgment of the Court of Common Pleas of Chester County be, and the same is hereby, affirmed.

562

Messrs. Justices Stabler and Carter concur.

Mr. Justice Cothran (concurring and dissenting): I think that the principles of law applicable to this case are correctly set forth in the opinion of Mr. Justice Blease, and concur in his conclusion that the defendant's motion for a directed verdict so far as actual damages are concerned was properly refused. I do not think, however, that there is the slightest evidence of ratification on the part of the defendant company of the alleged willful act of the conductor, and that, as correctly stated in the opinion, the issue of punitive damages is to be determined by the Federal law upon the subject which is accurately declared. The only circumstance relied upon to establish ratification by the company is the fact that the ejection was reported to the company by the conductor. It is hardly reasonable to suppose, and the evidence fails to show that his report gave any intimation of the alleged willful circumstances attending the ejection. In order to constitute ratification it should appear that the principal was acquainted with such misconduct. I think, therefore, that the verdict should have been directed for the defendant so far as punitive damages are concerned.