13126

PHILLIPS v. ATLANTIC COAST LINE R. CO. *ET AL.*

(158 S. E., 274)

May, 1930.

*Messrs. Henry E. Davis* and *Lide & McCandlish,* for appellants,

*Messrs. H. E. Yarboro, Jr., J. C. Hooks* and *A. F. Woods,* for respondent,

April 20, 1931.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

This is an action in tort. The complaint alleges that at Chadbourn, N. C., on October 2, 1929, the plaintiff, with her three children of the ages of seven years, five years, and twenty months, respectively, boarded a regular passenger train of the defendant railway company, which was in charge of the defendant Gregg, as conductor, for the purpose of returning to her home in Mullins, S. C.; that she did not have sufficient time at Chadbourn to purchase tickets, but boarded the train expecting to pay the fare in cash; that shortly after the train left Chadbourn the conductor asked

her for her tickets, but she informed him that she had not had time to purchase tickets and therefore desired to pay cash for the transportation; that thereupon the conductor asked her "in a violent, rude and angry manner if she did not know it was the law to buy tickets," and informed her that the fare would be $1.14 for her and $.65 for each of two of the children, to which she replied that the second child was only five years old, and that she had never previously been required to pay fare for a child of that age; that in reply the conductor "in a rude, angry and violent manner" told her that she would have to pay for the child in question; that she then stated to him that she was willing to pay if such was the law, but that she had always understood differently, and did not care to pay for the child until assured by the railway agent at Mullins that she ought to pay, in which event she would gladly pay the fare demanded; that she then offered him two $1 bills for the payment of fare, which he declined to receive, stating "in a loud, violent, rude, angry, disrespectful and insulting manner," in the presence of other persons occupying the coach, that she was not a lady or she would raise no question about the fare, and then went on his way through the train without taking the money tendered him; that she continued to hold the money, and a few minutes later the conductor approached her from the rear, reached over her shoulder, and rudely snatched the money from her hand, giving her one cent in change, and rudely stating that he had gotten the proper fare any way. The complaint further alleges that:

"Plaintiff was much unnerved, frightened, mortified and humiliated by the violent, disrespectful, insulting, willful, wanton and malicious conduct of the conductor of the defendant, Atlantic Coast Line Railroad Company, as above described, and as a result thereof she then suffered and has continued to suffer great humiliation, mortification, nervous shock, mental distress, sickness and physical injury, to her

damage in the sum of fifteen thousand dollars, all of which was caused by the joint and concurrent acts of the defendants hereinbefore described."

The defendants filed separate answers, denying the material allegations of the complaint, and setting up as a defense that on the occasion referred to in the complaint the plaintiff was an interstate passenger under an interstate contract of carriage; that such contract is controlled exclusively by the tariffs on file with the Interstate Commerce Commission and by the applicable principles of law as declared by the Federal Courts, and that under such tariffs and principles of law it was necessary and proper to require payment of fare on the part of plaintiff and her two children, one of whom was five and the other seven years of age. The defendant railway company set up as a further defense that on the occasion referred to in the complaint the plaintiff was an interstate passenger under an interstate contract of carriage; that such contract is controlled exclusively by the applicable principles of law as declared by the Federal Courts; and that hence the company was not liable for the alleged misconduct of its codefendant in manner or language.

At the close of plaintiff's testimony, the defendant company made a motion for a nonsuit on the ground that it appeared from the evidence offered by plaintiff that her suit grew out of a contract for transporting her by the railway company as a passenger in interstate commerce, and there was no proof sustaining her right to recover either actual or punitive damages from that defendant. The motion was refused, and, at the close of all the testimony, the company made a motion for a directed verdict on similar grounds. This motion also was refused, and the jury found for the plaintiff $200.00 actual damages and $300.00 punitive damages. Thereupon the defendants moved for a new trial on the ground that there was no proof of either actual or punitive damages. This motion also was denied.

The exceptions impute error to the trial Judge in refusing the motions for a nonsuit, for a directed verdict, and for a new trial, and in refusing to charge defendants' fourth request, as follows: "If you find from the evidence in this case that the plaintiff is entitled to recover at all, your verdict can include only actual damages, that is to say, such damages as will compensate her for the injury suffered by her, if any. She is not entitled under the law to what is called punitive or exemplary damages."

The appeal centers around the question as to whether the rules of the Federal Courts or those of the State Courts are applicable in the case. It seems to be conceded that the Congress of the United States has been given the paramount authority over commerce among the several States, but that, until Congress has exercised such authority, the States may legislate, notwithstanding such legislation may apply to an interstate carrier and have an incidental effect upon interstate commerce.

In *Cooley v. Port Wardens,* 12 How., 299, 319, 13 L. Ed., 996, the United States Supreme Court said: "The mere grant of such a power to Congress, did not imply a prohibition on the States to exercise the same power; that it is not the mere existence of such a power, but its exercise by Congress, which may be incompatible with the exercise of the same power by the States, and that the States may legislate in the absence of congressional regulations."

And again in *Penn. R. Co. v. Hughes,* 191 U. S., 477, 24 S. Ct., 132, 135, 48 L. Ed., 268: "It is well settled that the State may make valid enactments in the exercise of its legislative power to promote the welfare and convenience of its citizens, although in their operation they may have an effect upon interstate traffic."

And, commenting on a quotation from an earlier case (*Chicago, M. & St. P. R. Co. v. Solan,* 169 U. S., 133, 18 S. Ct., 289, 42 L. Ed., 688):

"It is true that this language was used of a statute of Iowa enacting a rule of obligation for common carriers in that State. But the principle recognized is that, in the absence of Congressional legislation upon the subject, a State may require a common carrier, although in the execution of a contract for interstate carriage, to use great care and diligence in the carrying of passengers and transportation of goods, and to be liable for the whole loss resulting from negligence in the discharge of its duties.

"We can see no difference in the application of the principle based upon the manner in which the State requires this degree of care and responsibility, whether enacted into a statute or resulting from the rules of law enforced in the State Courts."

In *M. P. Railway Company v. Larabee Flour Mills Company,* 211 U. S., 612, 29 S. Ct., 214, 217, 53 L. Ed., 352, the Court refers to the "oft-repeated rule that the State, in the absence of express action by Congress may regulate many matters which indirectly affect interstate commerce, but which are for the comfort and convenience of its citizens," and adds: "Of the existence of such a rule there can be no question."

And, referring to the contention that the Congress, by creating the Interstate Commerce Commission and giving to it a large measure of control over interstate commerce, withdrew from the State all power in respect to regulations of a local character, said: "This proposition cannot be sustained. Until specific action by Congress or the Commission, the control of the State over these incidental matters remains undisturbed."

In *Adams Express Company v. Croninger,* 226 U. S., 491, 33 S. Ct., 148, 149, 57 L. Ed., 314, 44 L. R. A. (N. S.), 257, the Court said:

"That the constitutional power of Congress to regulate commerce among the States and with foreign nations comprehends power to regulate contracts between the shipper

and the carrier of an interstate shipment by defining the liability of the carrier for loss, delay, injury, or damage to such property, needs neither argument nor citation of authority.

"But it is equally well settled that until Congress has legislated upon the subject, the liability of such a carrier, exercising its calling within a particular State, although engaged in the business of interstate commerce, for loss or damage to such property, may be regulated by the law of the State. Such regulations would fall within that large class of regulations which it is competent for a State to make in the absence of legislation by Congress, growing out of the territorial jurisdiction of the State over such carriers, and its duty and power to safeguard the general public against acts of misfeasance and nonfeasance committed within its limits, although interstate commerce may be indirectly affected. * * * In the *Solan case,* cited above, it was said of such State legislation:

" 'They are not, in themselves, regulations of interstate commerce, although they control, in some degree, the conduct and the liability of those engaged in such commerce. So long as Congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the State to regulate the relative rights and duties of all persons and corporations within its limits.' "

In *Simpson v. Shepard,* 230 U. S., 352, 33 S. Ct., 729, 744, 57 L. Ed., 1511, 48 L. R. A. (N. S.), 1151, Ann. Cas., 1916-A, 18, the Court said:

"Interstate carriers, in the absence of Federal statute providing a different rule, are answerable according to the law of the State for nonfeasance or misfeasance within its limits. * * *

"So, where Congress has not intervened, State statutes providing damages for wrongful death may be enforced not only against land carriers, but also against the owners of

vessels engaged in interstate commerce where the wrong occurs within the jurisdiction of the State.

Appellants contend that Title 49, Transportation Act of the United States Code, conclusively shows that Congress has covered in this Act the entire field relating to interstate passengers, to the exclusion of State statutes and the rules of law announced by State Courts, and rely, in support of that contention, upon Section 1, Subd. 7, prescribing that no common carrier shall directly or indirectly issue or give any interstate free ticket, free pass, etc., except to certain designated persons; Section 6, Subd. 7, prescribing that no carrier shall engage or participate in the transportation of passengers or property unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of the chapter, and that no carrier shall charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers between the points named in such tariff, etc.; and Section 10, forbidding any discrimination in rates, fares, or charges for the transportation of passengers, and imposing a severe penalty for violation by a common carrier.

We find in these provisions of the Act, however, no specific regulations as to the liability of a carrier for injury to an interstate passenger and no provision from which it can reasonably be inferred that Congress intended to exclude State regulation of that matter. In this respect the case is similar to that of *Penn. R. Co. v. Hughes, supra*, in which the Supreme Court of the United States referred at length to various provisions of the Interstate Commerce Act of Congress, adding that "we look in vain for any regulation of the matter here in controversy."

In *Southern Pacific Company v. Schuyler*, 227 U. S., 601, 33 S. Ct., 277, 280, 57 L. Ed., 662, 43 L. R. A. (N. S.), 901, which was a review of a judgment of the State Court of Utah affirming a judgment awarding damages against a

carrier for the death of an employee in the railway mail service, not at that time on duty, the Court said:

"Whether the Hepburn Act prohibits a carrier from giving free interstate transportation to the employees of the railway mail service when they are not on duty, but are traveling for their own benefit or pleasure, is, of course, a Federal question.

"But whether—assuming that question to be answered in the affirmative—the relation of carrier and passenger arises in the case of gratuitous passage under circumstances such as are presented in this case is (in the absence of an Act of Congress regulating the matter) a question not of Federal but of State law.    *    *    *

"The deceased no more forfeited his life, limb, or safety, and no more forfeited his right to the protection accorded by the local law to a passenger in his situation, than the carrier forfeited its right of property in the mail car upon which the deceased rode. His right to safe carriage was not derived, according to the law of Utah, from the contract made between him and the carrier, and therefore was not deduced from the supposed violation of the Hepburn Act. It arose from the fact that he was a human being, of whose safety the plaintiff in error had undertaken the charge. With its consent he had placed his life in its keeping, and the local law thereupon imposed a duty upon the carrier, irrespective of the contract of carriage. The Hepburn Act does not deprive one who accepts gratuitous carriage, under such circumstances, of the benefit and protection of the law of the State in this regard."

In the case of *C., R. I. & P. R. R. Co. v. Maucher,* 248 U. S., 359, 39 S. Ct., 108, 63 L. Ed., 294, a review of a judgment of the Supreme Court of the State of Nebraska (100 Neb., 237, 159 N. W., 422), affirming a judgment of a lower Court in that State in favor of the plaintiff, a circus employee, against a railway company to recover damages

for personal injuries sustained in a collision between a circus train and a regular passenger train, the Court said:

"The railway defended on the ground that its contract with Barnum & Bailey, and thus with the plaintiff, operated to release it from all liability; that, since the contract related to a movement in interstate commerce, its validity was to be determined by the Federal law; and that by the Federal law the contracts were valid, although undertaking to release the railway from liability, since it was not acting as a common carrier. *Santa Fe, P. & P. R. Co. v. Grant Bros. Constr. Co.*, 228 U. S., 177, 57 L. Ed., 787, 33 S. Ct., 474. The trial Court held that the liability was to be determined by the law of Nebraska, and entered judgment for plaintiff, which was affirmed by the Supreme Court of the State. *Maucher v. Chicago, R. I. & P. R. Co.*, 100 Neb., 237, 159 N. W., 422. The case came here on writ of error under Section 237 of the Judicial Code (Act March 3, 1911, c., 231, 36 Stat., 1156 [Comp. St., 1916, § 1214]).

"The railway admits that, prior to the enactment of the Carmack Amendment (Act June 29, 1906, c. 3591, § 7, Pars. 11, 12, 34 Stat., 584, 595 [Comp. St. 1916, § 8604a, 8604aa]), Congress had not dealt with the right of carriers to limit by contract their liability for injuries occurring in interstate transportation, and that consequently the States were free to establish their own laws and policies and apply them to such contracts. *Pennsylvania R. Co. v. Hughes*, 191 U. S., 477, 48 L. Ed., 268, 24 S. Ct., 132. But it contends that this power of the States was superseded by the Carmack Amendment, since that amendment dealt with the power of carriers to contract in respect to such liability (*Adams Exp. Co. v. Croninger*, 226 U. S., 491, 57 L. Ed., 314, 44 L. R. A. [N. S.], 257, 33 S. Ct., 148; *Boston & M. R. Co. v. Hooker*, 233 U. S., 97, 58 L. Ed., 868, L. R. A., 1915-B, 450, 34 S. Ct., 526, Ann. Cas., 1915-D, 593); that it was the intention of Congress to deal with the whole subject; and that the rights of plaintiff in respect to per-

sonal injuries are governed by the Federal law. But the Carmack Amendment deals only with the shipment of property. Its language is so clear as to leave no ground for the contention that Congress intended to deal with the transportation of persons. * * * The case presents no substantial Federal question."

In the case of *Gooch v. Oregon Short Line R. Co.*, 258 U. S., 22, 42 S. Ct., 192, 193, 66 L. Ed., 443, in deciding that the provisions of the Interstate Commerce Act as to giving notice of claims did not refer to the claims of passengers for personal injuries, the Court said: "On the contrary it is impossible to suppose that Congress when it was dealing with notices of claims, and even with the claims of passengers for baggage, Act of August 9, 1916, c. 301, 39 Stat., 441, 442 (Comp. Stat., § 8604a [49 U. S. C. A., § 20 (11)], Fed. Stat., Anno. Supp., 1918, p. 387), should not have thought of their claims for personal injuries, and as it passed them by, we must suppose that it was satisfied to leave them to the Interstate Commerce Commission and the common law."

In *Penn. R. Co. v. Hughes, supra,* the following is quoted with approval from an earlier decision of the United States Supreme Court: "A carrier exercising his calling within a particular State, although engaged in the business of interstate commerce, is answerable, according to the law of the State, for acts of nonfeasance or of misfeasance committed within its limits. If he fails to deliver goods to the proper consignee at the right time and place, or if by negligence in transportation he inflicts injury upon the person of a passenger brought from another State, the right of action for the consequent damage is given by the local law."

But appellants contend further that the Supreme Court of this State has recognized that in all cases affecting interstate commerce the Federal law is binding and controlling, where the Federal question has been duly made, and rely, in support of this position, upon *Sanders v. Railway*

*Company*, 147 S. C., 487, 145 S. E., 400, 402, and *Paul v. Southern Railway Company*, 158 S. C., 550, 155 S. E., 884, 887.

In the *Sanders case* this Court said: "It is well established that, in all cases affecting interstate commerce the Federal law and the practice of the Federal Courts govern."

That case, however, involved damages for negligence in the interstate shipment of a carload of tomatoes, a transaction unquestionably covered, as this Court had in mind, by the Carmack Amendment, concerning which the United States Supreme Court, in *Adams Express Company v. Croninger, supra*, said: "That the legislation supersedes all the regulations and policies of a particular state upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue, and limits his power to exempt himself by rule, regulation, or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all State regulation with reference to it."

In the *Paul case*, Mr. Justice (now Chief Justice), Blease, who wrote the opinion of this Court, called attention to the fact that the jury were instructed that the case was governed by the Federal law, and that from this instruction there was no appeal, and said: "If the case were controlled by the decisions of this Court, there could be no question about the matter, but *it appears to be conceded* that we must follow the rule of the Federal Courts." (Italics added.)

We do not think, therefore, that these two cases support appellants' position. We conclude, from a consideration of the whole matter, that, under the present status of Federal law the rules and practice of the State Courts govern in a case of this kind.

It is unnecessary to discuss the evidence in this case in detail. Testimony for the plaintiff tended to support the allegations of the complaint as to what took

place between her and the conductor. She testified that the transaction mortified, embarrassed, frightened, and humiliated her, and it caused her nerves to become unstrung, and that she was made sick by the experience, was still suffering from it, and that she has not been well since. Her husband also testified that before the incident her health was good, and that since she has been sick almost continuously. It is only fair to appellants to state—though it has no bearing on the issues here—that the plaintiff conceded at the trial that she has since learned that the law requires a five-year-old child to pay transportation fare.

Appellants contend that the evidence fails to show that plaintiff suffered any physical injury—but only mental anguish—and that therefore, under the rules of law laid down in the Federal Courts, she cannot recover any actual damages. As we have held, however, that the case is governed by the rules laid down in the State Courts, this position cannot be maintained.

*Lipman v. A. C. L. R. Co.,* 108 S. C., 151, 93 S. E., 714, 715, L. R. A., 1918-A, 596, was an action for damages for mental anguish caused by insulting language addressed to plaintiff by the conductor of the train on which plaintiff was a passenger. No other injury was alleged. Defendant demurred for insufficiency. The Court overruled the demurrer, using this strong language:

"The fourth ground of demurrer is based upon the broad proposition that a carrier is not liable for mental suffering inflicted upon his passengers by his servants, in the absence of physical injury. Otherwise stated, the contention amounts to this: Unless some physical injury is done, a carrier or his servants may insult, abuse, or apply to a passenger offensive and opprobrious epithets, and hold him up to the ridicule and contempt of his fellow passengers; and may use, or permit others to use, profane or obscene language in the presence of cultivated and refined women, and subject them to wanton approaches, with impunity. This partial state-

ment of the consequences of such a rule is enough to show that its application to the relation of carrier and passenger would be intolerable and a reproach to the law of any civilized state. * * *

"For reasons that need not be stated here, the relation between carrier and passenger involves special and peculiar obligations and duties, differing in kind and degree from those of almost every other legal or contractual relation. On account of the peculiar situation of the parties, the law implies a promise and imposes upon the carrier the corresponding duty of protection and courteous treatment Therefore the carrier is under the absolute duty of protecting his passengers from assault or insult by himself or his servants."

After further discussion of the general rule in connection with carriers of passengers, the Court said: "Moreover, the question cannot be regarded as an open one in this state. While it is true that, in the cases below cited, there were other elements of injury, nevertheless it was held that damages for mental suffering alone are recoverable of a carrier for an unprovoked insult to a passenger by the carrier's agent.

In *Cave v. Ry.*, 94 S. C., 282, 287, 77 S. E., 1017, 1020 L. R. A., 1915-B, 915 Ann. Cas., 1915-A, 1065, it was said:

" 'The Courts have not defined, and it would be unwise to attempt to define accurately, the kind of language which must be used by a conductor to a passenger before liability will be imposed upon the carrier. Ordinarily too much depends upon the circumstances, the relation of the parties, the tone and manner in which a thing is said, for any exact definition or rule to be laid down. But there can be no doubt that where a conductor uses language to a passenger which is calculated to insult, humiliate, or wound the feelings of a person of ordinary feelings and sensibilities, and it is intended to have that effect, the carrier is liable, for the contract of carriage impliedly stipulates for decent, courte-

ous, and respectful treatment at the hands of the carrier's servants.'

"While there was difference of opinion as to whether the language there used was insulting, there was none on the question of liability for the use of insulting language. In *Adams v. Ry.*, 103 S. C., 327, 87 S. E., 1007, L. R. A., 1916-D, 1183, every element of damage, except the alleged insulting language used, was eliminated by the decision of this Court, and the case was remanded for a new trial on that issue alone, which necessarily involved the holding that plaintiff might recover for mental suffering alone caused by insulting language."

But, even if damages could not be recovered for mental anguish and suffering, in the absence of bodily injury, it is held in *Spaugh v. A. C. L. Railroad Company*, 158 S. C., 25, 155 S. E., 145, 147, that: "In order to receive bodily injury, it was not necessary that the plaintiff should lose a limb or receive a broken limb, or to have wounds inflicted on her body. Having her nervous system injured and being made sick, in the manner she testified, constitutes bodily injury, and for which she should be entitled to recover damages in proportion to such injury. * * * Suffering from a nervous breakdown, as a result of defendant's negligence, would support a verdict for the plaintiff, independent of any other injury she sustained."

It is clear, therefore, that in any view of the matter, the testimony was sufficient to go to the jury on the question of actual damages.

It is contended that plaintiff would not be entitled to punitive damages against the company for the further reason that the evidence fails to show that any willfulness on the part of the conductor was brought home to the company, "either by knowledge before the event or by ratification after the event," as required by the Federal Courts, and the case of *Turman v. Railway Company*, 105 S. C., 287, 89 S. E., 655, 656, is cited in support of that

view. The plaintiff in the *Turman case* was riding on a "free pass," called an employee's trip pass. It was held that "the Federal Law must control, for the contract of carriage was interstate, and was dependent upon the act of Congress regulating passes for employees' families," the case being clearly decided upon the theory that an act of Congress regulated the exact matter at issue. Appellants' counsel contend that there is no provision in the Transportation Act as to the extent of liability of a common carrier when the passenger is riding on a pass—in other words, that there is no act of Congress applicable to the situation. Even if this be true, it does not alter the fact that this Court decided the case upon the theory that there was such an act of Congress. If there was no such act, then the Court was in error as to that fact, but the principle of law on which the case was decided was not thereby affected. Consequently, the *Turman case* is not authority for appellants' position.

We have no hesitancy in saying that, if the rules of the Federal Court governed, plaintiff would not be entitled to recover punitive damages against the defendant company. There was no contention that the alleged willfulness of the conductor was "brought home" to the company by knowledge before the event. Neither was there any evidence from which ratification after the event could reasonably be inferred. But in this State ratification by the master need not be shown in order to entitle the plaintiff to recover punitive damages: "It is well settled that a carrier of passengers is liable for the torts of the agents selected by him to perform the contract of carriage when they are committed in the performance of that duty." See *Lipman case, supra*.

The exception as to the refusal to charge appellants' fourth request is disposed of by what we have already said. Under the view that the rules of the State Court prevail, it would have been error to charge it.

All exceptions are overruled, and the judgment of the Circuit Court is affirmed.

Mr. Chief Justice Blease and Mr. Justice Carter and Mr. Acting Associate Justice John I. Cosgrove concur.

Mr. Justice Cothran (concurring and dissenting) : This is an action for actual and punitive damages which the plaintiff seeks to recover by reason of the alleged breach of a contract for the proper transportation of herself as a passenger en route from Chadbourn in the State of North Carolina to Mullins in the State of South Carolina, a contract admittedly involving rights and obligations in interstate commerce.

Upon a jury trial, a verdict for both actual and punitive damages was returned over the protest of the defendants, particularly as to punitive damages, who have properly presented the contention that, for the breach of such a contract as the plaintiff had with the railroad company, the damages recoverable must be measured by the Federal decisions, which in interstate transactions, and all others for that matter, deny the imposition of punitive damages against a master or principal based upon the willful act of a servant or agent, unless the superior has either authorized or ratified the act of the inferior.

I concur in the affirmance of so much of the judgment as is based upon actual damages, but dissent from so much of it as is based upon punitive damages by reason of the alleged willful act of the servant of the railroad company, so far as the railroad company is concerned, upon the ground that the imposition of punitive damages under the circumstances cannot be sustained under the Federal decisions which are controlling in matters affecting interstate commerce.

In *So. Express Co. v. Byers,* 240 U. S., 612, 36 S. Ct., 410, 60 L. Ed., 825, L. R. A., 1917-A, 197, the general principle is thus declared: "Manifestly the shipment was interstate commerce; and, under the settled doctrine established by our former opinions, rights and liabilities in connection therewith depend upon Acts of Congress, the bill of

lading and common-law principles accepted and enforced by the Federal Courts"—citing cases.

It is conceded that there is no Act of Congress or regulation of the Interstate Commerce Commission prescribing the nature of recoverable damages as a result of the breach of an interstate contract for the transportation of passengers; consequently, under the rule announced in the *Byers case,* just quoted, their nature must be ascertained by resort to "common-law principles accepted and ordered by the Federal Courts."

The question of the liability of a master or principal, in punitive damages for the willful act of a servant or agent, is elaborately discussed and definitely settled in the case of *Lake Shore & M. S. R. Co. v. Prentice,* 147 U. S., 101, 13 S. Ct., 261, 263, 37 L. Ed., 97, where the Court said: "In this Court the doctrine is well settled that in actions of tort the jury, in addition to the sum awarded by way of compensation for the plaintiff's injury, may award exemplary, punitive, or vindictive damages, sometimes called 'smart money,' if the defendant has acted wantonly, or oppressively, or with such malice as implies a spirit of mischief or criminal indifference to civil obligations. But such guilty intention on the part of the defendant is required in order to charge him with exemplary or punitive damages. [Citing cases.] Exemplary or punitive damages, being awarded, not by way of compensation to the sufferer, but by way of punishment of the offender, and as a warning to others, can only be awarded against one who has participated in the offense. A principal, therefore, though of course liable to make compensation for injuries done by his agent within the scope of his employment, cannot be held liable for exemplary or punitive damages, merely by reason of wanton, oppressive, or malicious intent on the part of the agent."

The legal issue for determination is whether this rule of the Federal decisions is to be applied to the present case, or the South Carolina rule, established by its decisons, which

permits the recovery of punitive damages for the willful act of a servant or agent, regardless of the question of authorization or ratification of the act by the master or principal.

I think that there can be no possible controversy as to the correctness of the following propositions:

(1) The contract relation between the plaintiff and the railroad company, for transportation from a point in North Carolina to a point in South Carolina, involved a transaction of interstate commerce, and the obligations and rights thereunder must be determined, normally, by the applicable provisions of the Federal law, to which all State law, by statute or judicial decision, must be held subservient.

(2) This is especially true where the regulation of the particular matter in question has been assumed either by Act of Congress or by authorized action of the Interstate Commerce Commission.

(3) Where such regulation has not been so assumed, there may exist an open zone within which State law may operate, notwithstanding its effect upon interstate commerce, provided it be of an incidental nature, ordained under the police power of the State for the protection of its citizens, and does not attempt to alter the nature or extent of the obligations of the contracting parties.

In reference to the last and only possibly controvertible one of the three propositions advanced, the zone of operations of a State law is clearly defined in the case of *Simpson v. Warehouse Commission,* 230 U. S., 352, 33 S. Ct., 729, 57 L. Ed., 1511, 48 L. R. A. (N. S.), 1151, Ann. Cas., 1916-A, 18 (known as the *Minnesota Rate Cases*). The syllabus is as follows: "There remains to the States the exercise of the power appropriate to their territorial jurisdiction in making suitable provision for local needs. The State may provide local improvements, create and regulate local facilities, and adopt protective measures of a reasonable character in the interest of the health, safety, morals and wel-

fare of its people, although interstate commerce may incidentally or indirectly be involved."

In the opinion of the Court it is said: "Further, it is competent for a State to govern its internal commerce, to provide local improvements, to create and regulate local facilities, to adopt protective measures of a reasonable character in the interest of the health, safety, morals, and welfare of its people, although interstate commerce may incidentally or indirectly be involved. * * * State inspection laws and statutes designed to safeguard the inhabitants of a State from fraud and imposition are valid when reasonable in their requirements, and not in conflict with Federal rules. * * * And the legislation of the States, safeguarding life and property and promoting comfort and convenience within its jurisdiction, may extend incidentally to the operations of the carrier in the conduct of interstate business, provided it does not subject that business to unreasonable demands, and is not opposed to Federal legislation."

In *Missouri, etc., R. Co. v. Harris,* 234 U. S., 412, 34 S. Ct., 790, 793, 58 L. Ed., 1377, L. R. A., 1915-E, 942, a Texas statute was sustained which allowed an attorney's fee of $20.00 in actions for claims of less than a specified amount. The Court said: "But the Texas statute now under consideration does not in anywise either enlarge or limit the responsibility of the carrier for the loss of property intrusted to it in transportation, and only incidentally affects the remedy for enforcing that responsibility. * * * The local statute, as already pointed out, does not at all affect the ground of recovery, or the measure of recovery; it deals only with a question of costs, respecting which Congress has not spoken."

The cases cited and quoted from in the leading opinion are entirely in accord with this proposition: *Penn. R. Co. v. Hughes,* 191 U. S., 477, 24 S. Ct., 132, 48 L. Ed., 268; *Missouri, etc., R. Co. v. Larabee,* 211 U. S., 612; *Adams Express Co. v. Croninger,* 226 U. S., 491, 33 S. Ct., 148,

57 L. Ed., 314, 44 L. R. A. (N. S.), 257; *Simpson v. Shepard,* 230 U. S., 352, 33 S. Ct., 729, 57 L. Ed., 1511, 48 L. R. A. (N. S.), 1151, Ann. Cas., 1916-A, 18.

The question then is presented whether or not the rule declared by the decisions of South Carolina is such an incidental matter, the exercise of the police power of the State, in aid of the security of a passenger, adding nothing to the nature or extent of the damages recoverable. To this question I do not think that there can be but one answer; that it does not come within the zone of the legitimate exercise of the State's regulation. It has not a suggestion of the regulation of the carrier's duty; it adds nothing to the security of a passenger; it changes the nature and extent of recoverable damages.

In *W. U. Tel. Co. v. Showers,* 112 Miss., 411, 73 So., 276, 277, the action was for actual and punitive damages on account of the alleged negligent and willful conduct of the agents of the telegraph company in delaying the transmission and delivery of the interstate telegram. The trial Court authorized recovery, not only for actual damages, but for punitive damages and for mental anguish, if the jury believed that the delay in the transmission of the message was due to wantonness, willfulness, or gross negligence on the part of the agents of the company in handling the message. Upon appeal from a judgment in favor of the plaintiff, the Court held: "The Mississippi rule as to punitive damages was invoked in this case by the plaintiff, and the Mississippi rule allows damages against the master for the wanton, willful, or gross negligent conduct of a servant. Under the Federal rule the master is not liable for punitive damages unless he participates in the wanton or malicious act of his servant or agent or subsequently ratifies it. *Lake Shore R. Co. v. Prentice,* 147 U. S., 101, 13 S. Ct., 261, 37 L. Ed., 97. Under the law as laid down in the case of *Express Co. v. Byers* [240 U. S., 612, 36 S. Ct., 410, 60 L. Ed., 825, L. R. A., 1917-A, 197], *supra,* the Federal rule as to punitive

damages applies; as the Court held in that case that the rules in force under the Federal statute are the rules of the common law 'accepted and enforced by the Federal Courts.' "

The case of *Express Company v. Byers,* 240 U. S., 612, 36 S. Ct., 410, 60 L. Ed., 825, L. R. A., 1917-A, 197, was an action for mental anguish damages arising out of the shipment of a coffin which was delayed to the mortification of the husband for whose wife the shipment was intended. Referring to this case, the Court in the Mississippi case, *W. U. Tel. Co. v. Showers,* 112 Miss., 411, 73 So., 276, 277, said: "The Court held, notwithstanding the State rule, that damages for mental anguish alone could not be recovered under the Federal law. In other words, this being a subject of interstate commerce, the Courts held that rights and liabilities of the parties must be determined by the Federal rule, and not by the statute or the common law of the State."

The Court in the *Byers case* said: "Manifestly the shipment was interstate commerce; and, under the settled doctrine established by our former opinions, rights and liabilities in connection therewith depend upon Acts of Congress, the bill of lading and common-law principles accepted and enforced by the Federal Courts." The Court proceeded to hold, citing half a page of authorities, that damages for mental anguish, in the absence of other injury, are not recoverable, that the trial Judge erred in refusing a request to charge according with this doctrine. It did not, of course, appear that there was a regulation by Act of Congress or by order of the Interstate Commerce Commission of the shipment of coffins; the decision was based upon the declaration that the shipment was interstate commerce, the regulation of which in all of its details, and especially in reference to the ground and extent of recovery in case of a breach of the obligations of the carrier, has been committed to the Federal authorities.

In *Hall v. W. U. Tel. Co.,* 108 S. C., 502, 94 S. E., 870, 871, following the *Byers case,* this Court held that a con-

tract for sending a telegram from one State to another was one involving interstate commerce, and was governed by the Federal law, which denied a recovery of damages for mental anguish. The Court said: "The Federal law governs and controls such contracts, and must control to the exclusion of all State laws which directly or indirectly affect the contract." Certainly a law, statute, or decision, which affects not only the character of, but the amount of recovery upon, an interstate contract, directly affects it.

Later in the case of *Berg v. Tel. Co.,* 110 S. C., 169, 96 S. E., 248, 250, the Court said:

"Having reached the conclusion that this is an interstate message, it is only necessary to cite the case of *Hall v. W. U. Tel. Co., supra,* to sustain the proposition that the Federal law does not recognize mental anguish as an element of damages in such cases." In reference to the issue of punitive damages, the Court said:

"The last question is whether there was error in directing a verdict as to punitive damages. The cases of *Turman v. Railway,* 105 S. C., 287, 89 S. E., 655, and *De Loach v. Railway,* 106 S. C., 155, 90 S. E., 701, announce the rule in the Federal Courts that the master is not liable for the willfulness of the servant unless he had knowledge before the event, or afterwards ratified the wrongful act of the servant."

It is suggested that the *Turman case* does not support the contention of the appellant in this instance, for the reason that it is declared in the opinion of the Court that the contract under consideration was "dependent upon the Act of Congress regulating passes for employees' families." The Court said this: "But when the plaintiff rested with proof of willfulness on the part of the engineer, and imputed that to the corporation, the Federal law denies such an influence [imputation?] ; and in the instant case the Federal law must control, for the contract of carriage was interstate, and was dependent upon the Act of Congress regulating passes for

employees' families." In view of the fact that Section 8563 Compiled Statutes contains nothing but a permission to the carrier to issue such passes, an exception to the general inhibition against passes, the Court could have meant nothing by that statement except to refer to such permission, which contains nothing relating to regulation. See, also, *De Loach v. R. Co.,* 106 S. C., 155, 90 S. E., 701.

In *Poor v. Tel. Co.,* 196 Mo. App., 557, 196 S. W., 28, 29, the Court said: "Being therefore a common carrier within the meaning of the Interstate Commerce Statutes, and engaged in interstate commerce with respect to the particular message in controversy, the defendant telegraph company is subject to and governed by the Federal law as expounded and applied by the Federal Courts to the exclusion of all State laws and decisions."

In *Jacobs v. Tel. Co.,* 196 Mo. App., 300, 196 S. W., 31, it was held that the liability of telegraph company for errors in interstate telegram must be determined in the light of Federal Statutes and decisions. See, also, *Davis v. Tel. Co.,* 198 Mo. App., 692, 202 S. W., 292. To the same effect is *Nichols v. Tel. Co.,* 44 Nev., 148, 191 P., 573; *Norris v. Tel. Co.,* 174 N. C., 92, 93 S. E., 465; *Askew v. Tel. Co.,* 174 N. C., 261, 93 S. E., 773; *Tel. Co. v. Schade,* 137 Tenn., 214, 192 S. W., 924; *Durre v. Tel. Co.,* 165 Wis., 190, 161 N. W., 755; *Gibbs v. Tel. Co.,* 196 N. C., 516, 146 S. E., 209.

In the *Solan case,* 169 U. S., 133, 18 S. Ct., 289, 42 L. Ed., 688, the conflict was between a clause in a drover's contract, which purported to relieve the carrier from the consequences of a negligent injury to him, and a State statute, which negatived the efficacy of such a contract. It was not, as here, a conflict between a rule of the Federal decisions and a rule of the State decisions. It was properly held that, in the absence of Federal law upon the subject, the statute of the State had priority over a clause in the contract.

In the *Hughes case,* 191 U. S., 477, 24 S. Ct., 132, 136,

48 L. Ed., 268, the decision in the *Solan case* was followed; the Court adding: "The State has a right to promote the welfare and safety of those within its jurisdiction by requiring common carriers to be responsible to the full measure of the loss resulting from their negligence, a contract to the contrary notwithstanding." It is quite another thing to hold the carrier liable for a species of damages, a doctrine repudiated by the Federal law, which has the force of a Federal statute. As the Court says in the *Hughes case:* "We can see no difference in the application of the principle based upon the manner in which the State requires this degree of care and responsibility, whether enacted into a statute or resulting from the rules of law enforced in the State Courts." A like rule should apply to the Federal decisions. To allow punitive damages in a case when the Supreme Court of the United States holds it is not permissible to allow them is as clearly against the rule there laid down as could be conceived.

In *Charleston & W. C. R. Co. v. Varnville,* 237 U. S., 597, 35 S. Ct., 715, 716, 59 L. Ed., 1137, Ann. Cas., 1916-D, 333, the penalty statute of South Carolina applicable to nonpayment of claims within a certain time was held void as a burden upon interstate commerce. The Court there said: "It is suggested that the act is in aid of interstate commerce. The State law was not contrived in aid of the policy of Congress, but to enforce a State policy differently conceived; and the fine of $50.00 is enough to constitute a burden."

Certainly the unbridled license to a jury to impose a penalty of $15,000.00, the amount claimed in the complaint, cannot be considered less of a burden.

In *Atlantic Coast Line v. Georgia,* 234 U. S., 280, 34 S. Ct., 829, 831, 58 L. Ed., 1312, the Court said: "The requirements of a State, of course, must not be arbitrary, or pass beyond the limits of a fair judgment as to what the exigency demands. * * *"

In *So. R. Co. v. King,* 217 U. S., 524, 30 S. Ct., 594, 54 L. Ed., 868, and *S. A. L. R. Co. v. Blackwell,* 244 U. S., 310, 37 S. Ct., 640, 61 L. Ed., 1160, L. R. A., 1917-F, 1184, it was held that the validity of a statute of Georgia regulating the speed of interstate trains is dependent upon its reasonableness; in each case the statute was held a burden upon interstate commerce, although neither Congress nor the Interstate Commerce Commission had undertaken to regulate the matter. Surely the Court would not hold a rule of damages reasonable which in case after case it had declared improper to enforce.

It cannot be conceived that the duty of a carrier to a passenger would be at all impressed upon the carrier or its performance improved by punishing the carrier for a wanton act of one of its agents which it had not authorized, did not participate in, did not ratify and specifically condemned. As the Court says in the *Prentice case:* "Exemplary or punitive damages, being awarded, not by way of compensation to the sufferer, but by way of punishment of the offender, and as a warning to others, can only be awarded against one who has participated in the offense."

I think, therefore, that there was sufficient evidence in the case to carry to the jury the question of actual damages as against both defendants, and the question of punitive damages against the servant, but not of punitive damages against the railroad company.